STATE OF HAWAII, Plaintiff-Appellee, *v.* SABURO MIYASAKI, Defendant-Appellant

NO. 7288

JULY 11, 1980

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

This case reaches us on an interlocutory appeal from an order of the Circuit Court of the Third Circuit denying defendant-appellant's motion to dismiss an indictment charging a violation of HRS § 710-1072.5, Obstruction of Justice.[1] The indictment arose from his refusal to cooperate in a grand jury investigation of illicit gambling on the island of Hawaii. The issue presented is the constitutionality of a section of the state's general witness immunity statute that provides immunity in exchange for potentially incriminating information from a witness. More precisely, the question is whether a section of the foregoing statute which forbids the direct or indirect *use* of any evidence obtained through compulsion authorized thereunder affords immunity that is coextensive with the protection bestowed by the Constitution of the State of Hawaii.

I.

Defendant-appellant was summoned as a witness before the Grand Jury of the Third Circuit and there interrogated about his gambling on the results of football games over a period of several months in 1978 and 1979. These activities were already the basis of a criminal charge then pending against him in the District Court of the Third Circuit. Anticipating the assertion of a privilege against self-incrimination

---

[1] HRS § 710-1072.5 reads:

(1) A person commits the offense of obstruction of justice if he intentionally engages in the following conduct: When called as a witness and having been granted immunity pursuant to chapter 621C before or after having been qualified as a witness, shall refuse to testify or be qualified as a witness when duly directed to testify or be qualified as a witness.

(2) Obstruction of justice is a class "C" felony.

under the Constitutions of the United States and of the State of Hawaii, the prosecutor had earlier sought and obtained, pursuant to HRS chapter 621C, an ex parte order from the circuit court compelling testimony and granting the witness immunity. The immunity granted was the *use and derivative use* immunity described in HRS § 621C-3[2] and not the *transactional* immunity provided by § 621C-4.[3]

At the outset the witness was advised of his constitutional privilege. When the prosecutor's inquiries progressed beyond a preliminary stage, the expected claim of privilege ensued. The prosecutor thereupon informed the witness the circuit court had actually negated his privilege through the foregoing grant of immunity pursuant to HRS § 621C-3, handed him the court's order, and proceeded to "explain" it. The written order essentially reiterated § 621C-3's terms but the prosecutor's "explanation" was an attenuated version of the order.[4] The order was then read aloud by the foreman of

---

[2] HRS § 621C-3 reads:

The testimony or production that is compelled under the order, and any information directly or indirectly derived from the testimony or production, may not be used against the person in any manner in a criminal case, except in a prosecution for perjury, for giving a false statement, or for an offense involving a failure to comply with the order; provided that such person may be prosecuted or punished for any crime so long as testimony or production that is compelled under the order, and any information directly or indirectly derived from such testimony or production, is not used against such person in such prosecution.

[3] A grant of *transactional* immunity provides a witness absolute protection against prosecution for any event or transaction he is compelled to furnish evidence about. *Use and derivative use* immunity does not prevent the witness from subsequently being prosecuted but prohibits the use of the evidence, or any leads directly or indirectly derived therefrom, against him in a criminal case.

[4] The prosecutor apparently believed § 621C-3 merely prohibited the direct or indirect *use* of the compelled testimony in criminal cases then pending against the witness as the following excerpt from the relevant Grand Jury transcript would seem to indicate:

I'd like to explain what use immunity is so you understand the difference. Use immunity is an immunity which means that anything that you do say before a proper forum, say, answering questions here, once you're granted it, cannot be used directly or indirectly against you in any *pending criminal case* except for perjury or giving false statement. In other words, if you lie today after you get use immunity, then you could be prosecuted for perjury, for example. With respect to

the grand jury, who also, upon the direction of the prosecutor, ordered the witness to respond to the prosecutor's questions. The witness admitted earlier betting on football games but balked at naming the "bookie" with whom he had placed bets during the 1977-78 football season. He was also interrogated on prior statements allegedly made to the police about the identity of the "bookie" but declined to confirm them.

The prosecutor elected to seek a criminal penalty for the recalcitrant conduct rather than civil enforcement of the order and secured an indictment charging a violation of HRS § 710-1072.5. Defendant-appellant moved to dismiss the indictment on the ground that HRS § 621C-3, the statutory basis for the order, violated Article I, Section 8 of the state constitution and was unconstitutional on its face.[5] The circuit court found the section facially valid and denied the motion. The court, however, authorized an appeal from the order denying the motion, pursuant to HRS § 641-17 which permits an appeal from an interlocutory order in a criminal case where the appeal would result in a more speedy termination of the case.

Defendant-appellant contends HRS § 621C-3 is invalid because the *use and derivative use* immunity provided thereunder is not coterminous with the privilege against self-incrimination bestowed by Article I, Section 10 of the Constitution of the State of Hawaii. A review of the statutory and constitutional provisions at issue, in light of the fundamental

---

*specifically pending charges* t. ∴ 'u have against you in the District Court, with the *proper grant of use immun*: ∵ your testimony here today cannot be used against you directly or indirectly ∵ prosecute you in the District Court on those gambling charges. [Emphasis a∴ '·d]
  § 621C-3, however, appears to ha. an effect of affording *use and derivative use* immunity extending beyond pending ·ses and for present purposes we read it to have such effect.

[5] Article I, Section 8 was amende. .d renumbered as Article I, Section 10 by the Constitutional Convention of Hawai. 1978 and the convention action was ratified by the electorate on November 7, 1∵ ·. Article I, Section 10 now reads in relevant part: "No person shall . . . be comp. .d in any criminal case to be a witness against *oneself*." (Underscoring added)

values underlying the privilege and of its historical development, convinces us that defendant-appellant's contention is correct.

## II.

The Fifth Amendment to the Constitution of the United States and Article I, Section 10 of the Constitution of the State of Hawaii state in pertinent part that:

> No person shall . . . be compelled in any criminal case to be a witness against himself (oneself) . . .

The values underlying this privilege or right are fundamental to law and liberty and some of the ideals in the complex of values supporting it were delineated by Justice Goldberg in *Murphy v. Waterfront Commission*, 378 U.S. 52 (1964), when he said:

> The privilege against self-incrimination "registers an important advance in the development of our liberty — 'one of the great landmarks in man's struggle to make himself civilized.' " *Ullmann v. United States*, 350 U.S. 422, 426. It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load," 8 Wigmore, Evidence (McNaughton rev., 1961), 317; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," *United States v. Grunewald*, 233 F.2d 556, 581-582 (Frank, J., dissenting), rev'd 353 U.S. 391; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the

guilty," is often "a protection to the innocent." *Quinn v. United States*, 349 U.S. 155, 162.

*Id.* at 55 (footnotes omitted).

The origins of this keystone of our accusatorial system of criminal justice are somewhat obscure and are not directly traceable to any of the landmarks in English history like the "Magna Carta, the Petition of Right, the Bill of Rights of 1689, or other basic English sources of our liberties."[6] Its development has been characterized as "a history of accretions, not of an avulsion."[7] However obscure its origins, the concept that an accused should not be compelled to incriminate himself was so ingrained in the judicial systems of colonial America that it was accorded constitutional status and inviolability when the Bill of Rights was enacted.[8] It has long been an integral part of the jurisprudence of Hawaii. *See The King v. Paakaula*, 3 Haw. 30 (1867); *Republic of Hawaii v.*

---

[6] De Luna v. United States, 308 F.2d 140, 144 (5th Cir. 1962) (footnotes omitted).

[7] *Id.*

[8] A capsulized version of the history of the privilege reads as follows:

The maxim *nemo tenetur seipsum accusare* had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons which had long obtained in Continental Europe and which until the expulsion of the Stuarts from the English throne in 1688 and the erection of additional barriers for the protection of the people against the exercise of arbitrary power was not uncommon in England. The celebrated trial of Sir Nicholas Throckmorton and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion but upon a general and silent acquiescence of the courts in a popular demand. But however adopted it has become firmly imbedded in English as well as American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States with one accord made a denial of the right to question an accused person a part of their fundamental law so that a maxim which in England was a mere rule of evidence became clothed in this country with the impregnabilities of a constitutional enactment. It has found engraftment into the various state constitutions and was written by the people of the Union through the medium of James Madison into the Federal Constitution. It secures a right of personal liberty which Congress itself cannot revoke and which no court should attempt to withhold.

Territory v. Cabrinha, 24 Haw. 621, 629-30 (1919) (Coke, C.J., dissenting).

*Parsons,* 10 Haw. 601 (1896); *Territory v. Cabrinha, supra; State v. Grahovac,* 52 Haw. 527, 480 P.2d 148 (1971).

Though cast in terms susceptible of a narrow reading that might have severely limited the situations in which it could be asserted, "[o]ur courts . . . have not stood for a narrow constitutional construction of the Fifth Amendment based on a literal reading of the language in the light of its historical origins."[9] In *Counselman v. Hitchcock,* 142 U.S. 547 (1892), a contention that an investigation before a grand jury was not a "criminal case" where the Fifth Amendment privilege could be pleaded brought this answer from the Court:

It is impossible that the meaning of the constitutional provision can only be, that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime. The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard.

*Id.* at 562. In the Court's view, the privilege was entitled to "a broad construction in favor of the right which it was intended to secure." *Id.* And subsequently, the Court described its breadth as follows:

The privilege is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant.

*McCarthy v. Arndstein,* 266 U.S. 34, 40 (1924).

---

[9] De Luna v. United States, *supra,* at 149.

### III.

While the right of a defendant to remain silent in a criminal prosecution against himself is unquestioned,[10] the pertinent constitutional expression does not necessarily extend the same absolute protection to a witness. Where the individual's rights to silence and privacy have clashed with the government's interest in law enforcement and the need for information, courts have compelled possibly self-incriminating evidence from witnesses under some circumstances, despite the ostensible constitutional proscription. A conferral of immunity pursuant to a statute may supplant the privilege and coerce testimony if the immunity afforded the witness is coextensive with the protection bestowed by the constitution. *Counselman v. Hitchcock, supra.*

In *Counselman* where a witness immunity statute was first examined by the United States Supreme Court, a law merely prohibiting the *use* of compelled testimony in subsequent criminal prosecutions was deemed an inadequate substitute for the privilege, the Court stating in part:

> We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. Section 860 of the Revised Statutes does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence [sic] to which the question relates.

*Id.* at 585-86.

---

[10]*See* HRS §§ 621-15, 621-18; State v. Alo, 57 Haw. 418, 558 P.2d 1012 (1976) *cert. denied*, 431 U.S. 922 (1977); State v. Santiago, 53 Haw. 254, 492 P.2d 657 (1971); State v. Grahovac, *supra.*

The Congressional response to this articulation of a basis for judging the validity of an immunity statute was the passage of a law compelling testimony and the production of other evidence on condition that no person could be "prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise. . . ." Act of Feb. 11, 1893, ch. 83, 27 Stat. 443 (1893). The *transactional* immunity described above was subsequently sanctioned in *Brown v. Walker*, 161 U.S. 591 (1896), where the Court found it sufficiently broad to supplant the privilege, as it exempted "the witness from any prosecution on account of any transaction to which he may testify." *Id.* at 595. The statute supplied the basic form for numerous *transactional* immunity statutes subsequently adopted throughout our federal system.[11]

Witness immunity in the courts remained on the course charted in *Counselman v. Hitchcock* and *Brown v. Walker* for more than seven decades. That *transactional* immunity was the required minimum for immunity grants was unquestioned and often reaffirmed by the Supreme Court from *Brown v. Walker* to *Malloy v. Hogan*, 378 U.S. 1 (1964), and its companion case, *Murphy v. Waterfront Commission, supra.* In *Ullmann v. United States*, 350 U.S. 422 (1956), for example, Justice Frankfurter in recounting the history of witness immunity in the Supreme Court said:

> *Brown v. Walker* was the second case to deal with an immunity statute. Four years previously, in *Counselman v. Hitchcock*, 142 U.S. 547, a unanimous Court had found constitutionally inadequate the predecessor to the 1893 statute because the immunity granted was incomplete, in that it merely forbade the use of the testimony given and failed to protect a witness from future prosecution based on knowledge and sources of information obtained from the compelled testimony. It was with this background that the 1893 statute, providing complete immunity from

---

[11] *See, e.g.*, HRS §§ 128-27, 271-34, 377-9, and 387-10.

prosecution, was passed and that *Brown v. Walker* was argued and decided. . . . The Court was closely divided in upholding the statute, and the opinions reflect the thoroughness with which the issues were considered. Since that time the Court's holding in *Brown v. Walker* has never been challenged; the case and the doctrine it announced have consistently and without question been treated as definitive by this Court, in opinions written, among others, by Holmes and Brandeis, JJ. *See, e.g., McCarthy v. Arndstein*, 266 U.S. 34, 42; *Heike v. United States*, 227 U.S. 131, 142.

*Id.* at 436-38. He further demonstrated the acceptance of *transactional* immunity as the definitive standard within the federal system by stating:

The 1893 statute has become part of our constitutional fabric and has been included "in substantially the same terms, in virtually all of the major regulatory enactments of the Federal Government." *Shapiro v. United States*, 335 U.S. 1, 6. For a partial list of these statutes, see, *id.*, at 6-7, n. 4. Moreover, the States, with one exception — a case decided prior to *Brown v. Walker* — have, under their own constitutions, enunciated the same doctrine, 8 Wigmore, Evidence (3d ed.), § 2281, and have passed numerous statutes compelling testimony in exchange for immunity in the form either of complete amnesty or of prohibition of the use of the compelled testimony. For a list of such statutes, see 8 Wigmore, Evidence (3d ed.), § 2281, n. 11 (pp. 478-501) and Pocket Supplement thereto, § 2281, n. 11 (pp. 147-157).

*Id.* at 438. That *transactional* immunity was "part of our constitutional fabric," at least until *Malloy* and *Murphy* if not until *Kastigar v. United States*, 406 U.S. 441 (1972), is irrefutable.

In *Malloy* the Court held "that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgement by the States." 378 U.S. at 6. *Murphy* resolved another thorny issue related to the scope of the privilege in interjurisdictional situations, the Court holding that "the constitutional privilege

against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law.'' 378 U.S. at 77-78. However, it went on to say:

> We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity.

*Id.* at 79 (footnote omitted). The foregoing portent of a possible departure from *transactional* immunity as the minimally appropriate substitute for the privilege was the germ of *use and derivative use* immunity statutes that followed. Even after *Murphy*, however, the Court reiterated the oft-stated opinion that no statute ''which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege. . . .'' *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 80-81 (1965).

The sufficiency of *use and derivative use* immunity as a substitute for the privilege was subsequently tested in *Kastigar v. United States, supra,* and *Zicarelli v. New Jersey State Commission of Investigation,* 406 U.S. 472 (1972). While the majority in both cases purportedly applied the test developed in *Counselman* and *Brown,* it concluded that *use and derivative use* immunity could provide sufficient protection for a witness from whom possibly incriminating evidence is extracted under compulsion of law. This was, of course, strongly disputed by the minority who viewed the Court's holding as an unwarranted dilution of the self-incrimination clause. *Kastigar, supra,* at 467 (Douglas, J. dissenting) and 467-71 (Marshall, J., dissenting).

Although *use and derivative use* immunity may now suffice for Fifth and Fourteenth Amendment purposes, whether HRS § 621C-3 affords protection coextensive with the self-incrimination clause of Article I, Section 10 of the Constitution of the State of Hawaii must still be answered by this court. For reasons set forth below, we find it does not.

## IV.

Defendant-appellant argues a proper construction of Article I, Section 10 of the Hawaii Constitution would mandate a reversal of the circuit court's denial of the motion to dismiss the indictment, in spite of *Kastigar* and *Zicarelli*. He cites in support this court's willingness to extend protections that "have an independent source in the Hawaii Constitution's privilege against self-incrimination" beyond the minima prescribed by the United States Supreme Court. *State v. Santiago, supra*, at 265-66, 492 P.2d at 664; *cf. Cooper v. California*, 386 U.S. 58, 62 (1967); *State v. Kaluna*, 55 Haw. 361, 520 P.2d 51 (1974).

We have not hesitated to "extend the protections of the Hawaii Bill of Rights beyond those of textually parallel provisions in the Federal Bill of Rights when logic and sound regard for the purposes of those protections have so warranted." *Id.* at 369, 520 P.2d at 58. We have recognized that "the Hawaii Supreme Court, as the highest court of a sovereign state is under the obligation to construe the state constitution, not in total disregard of federal interpretations of identical language, but with reference to the wisdom of adopting those interpretations for our state." *State v. Manzo*, 58 Haw. 440, 452, 573 P.2d 945, 953 (1977); *State v. Texeira*, 50 Haw. 138, 142 n.2, 433 P.2d 593, 597 n.2 (1967). In this regard, we have on occasion preferred a fair conception of the state constitution to judicial exegesis emanating from the Supreme Court, particularly where "unexpected" decisions from the Court "have forced a serious re-evaluation of ; . . fundamentals." *State v. Kaluna, supra*, 55 Haw. at 367, 520 P.2d at 57; *accord State v. Santiago, supra*.

We are mindful, however, "that the fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it." *HGEA v. County of Maui*, 59 Haw. 65, 80-81, 576 P.2d 1029, 1039 (1978). And in construing provisions of the Hawaii Bill of Rights, we have, where appropriate, sought guidance from Supreme Court decisions that "constituted the definitive interpretation of the borrowed language" when the Hawaii Constitution became effective. *State v. Manzo, supra*, 58 Haw. at 452-53, 573 P.2d at 953-54; *see also State v. Pokini*, 45 Haw. 295, 308, 367 P.2d 499, 506 (1961). Here, the definitive interpretation on the Fifth Amendment and immunity, announced in *Brown v. Walker* and followed without question for more than seven decades, prevailing when the Hawaii Constitution was drafted and adopted lends substantial support for a conclusion that the statutory protection afforded by HRS § 621C-3 is inadequate to terminate the constitutionally endowed privilege against self-incrimination.

The Constitution of the State of Hawaii was framed by the Constitutional Convention of 1950 and became the organic law of the State in 1959. The record of convention proceedings reveals that when the relevant provision was adopted, there was a definite intent to also adopt the interpretations of the Fifth Amendment to the Federal Constitution.[12] That portion of Committee of the Whole Report No. 5 covering the privilege against self-incrimination reads in pertinent part:

> This section is derived from the first three clauses of the 5th Amendment to the Federal Constitution and will give to this State the benefit of Federal decisions construing the same.

Committee of the Whole Report No. 5, *id.* at 301. Since the definitive doctrine borrowed by the framers of the Hawaii Constitution held that nothing less than immunity from prosecution would be adequate to supplant the privilege

---

[12] *See* Standing Committee Report No. 20 of the Committee on Bill of Rights (Proceedings of the Constitutional Convention of 1950, Vol. I at 164) and Committee of the Whole Report No. 5, *id.* at 301.

against self-incrimination, we are convinced they expected no less to be conferred in lieu of the privilege.

That *transactional* immunity had been "part of our constitutional fabric" from 1893 could not have been lost to a convention that included lawyers among its members.[13] Nor can we conclude the sanguine statements about the Fifth Amendment and interpretations strongly favoring the privilege may have escaped the members of a constitutional convention convened in 1950.[14] *Transactional* immunity is undoubtedly part of the "fabric" of Article I, Section 10, notwithstanding the tear in the "fabric" of the Federal Constitution caused by *Kastigar* and *Zicarelli.*

V.

A regard for the purpose of the privilege embodied in Article I, Section 10 further influences our opinion that the section of the general witness immunity statute authorizing grants of *use and derivative use* immunity is invalid. In the words of Justice Frankfurter,

> We are not dealing here with one of the vague, undefinable, admonitory provisions of the Constitution whose scope is inevitably addressed to changing circumstances. The privilege against self-incrimination is a specific provision of which it is peculiarly true that "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349. For the history of the privilege establishes not only that it is not to be interpreted literally, but also that its sole concern is, as its name indicates, with the danger to a witness forced to give testimony leading to the infliction of "penalties affixed to the criminal acts. . . ." *Boyd v. United States*, 116 U.S. 616, 634.

---

[13] This conclusion is bolstered when we note the chairman of its Committee on Bill of Rights was Justice Jack H. Mizuha, then a prominent lawyer, who later served with distinction as an associate justice of this court. *Id.* at 165.

[14] *See, e.g.*, McCarthy v. Arndstein, *supra;* Brown v. Walker, *supra;* Counselman v. Hitchcock, *supra;* Boyd v. United States, 116 U.S. 616 (1886).

*Ullmann v. United States, supra,* at 438-39 (footnote omitted). Given this "concern" of the privilege and its underlying values, our inquiry here must be whether we can, with reasonable assurance, state that HRS § 621C-3 places a witness in substantially the same position as though he had not been compelled to produce evidence. We find we can not.

The statute gives the government access to otherwise unavailable information by nullifying a constitutional privilege. Compulsion sanctioned by law is applied to elicit information on a promise that it will not be *used* in any way to prosecute the witness and the government receives something it would not be entitled to but for the statute. The witness, on the other hand, receives nothing he does not already have, for Article I, Section 10 already guarantees that he need not incriminate himself. Hence, he is not in the same position he was before he gave evidence — he may now have incriminated himself and he will also have been deprived of his privilege with respect to the transactions that are the subject of inquiry.

While the statute precludes the *use* of the information, the witness remains subject to prosecution. If the investigation produces allegedly "independent" evidence in sufficient quantity to prosecute him, he may then face a task at trial of establishing possible links between the government's case and his appearance before the investigatory body in the face of prosecutorial assertions to the contrary. The essential difficulty of determining whether a prosecution derives in some way from compelled evidence in the single jurisdiction situation involved here was captured by Justice Brennan when he said:

> In dealing with a single jurisdiction, we ought to recognize the enormous difficulty in attempting to ascertain whether a subsequent prosecution of an individual, who has previously been compelled to incriminate himself in regard to the offense in question, derives from the compelled testimony or from an "independent source." For one thing, all the relevant evidence will obviously be in the hands of the government — the government whose investigation included compelling the individual involved to incriminate himself. Moreover, this argument does not

depend upon assumptions of misconduct or collusion among government officers. It assumes only the normal margin of human fallibility. Men working in the same office or department exchange information without recording carefully how they obtained certain information; it is often impossible to remember in retrospect how or when or from whom information was obtained. By hypothesis, the situation involves one jurisdiction with presumably adequate exchange of information among its various law enforcement officers. Moreover, the possibility of subtle inferences drawn from action or non-action on the part of fellow law enforcement personnel would be difficult if not impossible to prove or disprove.

*Piccirillo v. New York*, 400 U.S. 548, 568 (1971) (dissenting opinion).

A prosecution would bring further problems that may not be resolved without prejudice to the witness, problems related to a decision to testify and a possible use in cross-examination of information gained from his appearance before the investigatory body. If he should testify at trial, he would, of course, be subject to cross-examination. The prosecutor may then be able to chart the cross-examination on the defendant's prior testimony and it is improbable he would be able to demonstrate that such questioning involved the direct or indirect *use* of immunized testimony. He may well be influenced to forego a right to testify. An incisive depiction of the dilemma of a defendant in this situation by Chief Judge Seitz of the United States Court of Appeals for the Third Circuit is set out in the margin.[15]

---

[15] In a criminal case, one of the most important decisions a defendant must make is whether to testify. If an individual, after being granted use immunity, is subsequently prosecuted for the same or a related transaction and elects to testify at trial in his own behalf, he must of course subject himself to cross-examination. The prosecutor is obviously in a position to tailor his questions, consciously or otherwise, on the basis of his knowledge of the defendant's prior testimony and can do so without any overt reference to the testimony given under immunity. In these circumstances, could defense counsel effectively object on the ground that the immunity grant was thereby violated? I think not. Indeed, how could a trial judge do other than accept the prosecutor's representation, which might well be

None of the foregoing problems would arise with a grant of *transactional* immunity as authorized by HRS § 621C-4. Where it is applied,

> [n]o question arises of tracing the use or non-use of information gleaned from the witness' compelled testimony. The sole question presented to a court is whether the subsequent prosecution is related to the substance of the compelled testimony. Both witness and government know precisely where they stand. Respect for law is furthered when the individual knows his position and is not left suspicious that a later prosecution was actually the fruit of his compelled testimony.

*Piccirillo v. New York, supra,* at 569 (Brennan, J., dissenting).

Since a conferral of *use and derivative use* immunity pursuant to HRS § 621C-3 does not maintain a person in substantially the same position he was before being compelled to produce incriminating evidence, we conclude there was no valid basis for charging a violation of HRS § 710-1072.5 here.

The order of the circuit court is reversed and the case is remanded with instructions to dismiss the indictment.

*Steven K. Christensen* for defendant-appellant.

*Stanford H. Masui (Douglas L. Halsted* on the brief), Deputy Prosecuting Attorneys, for State of Hawaii.

---

in good faith, that the questions were not inspired by the testimony given by the defendant under immunity? Furthermore, this same possibility may adversely influence a defendant to forego entirely his right to testify in his own behalf even though he is advised that his prior disclosures cannot be used against him.

United States ex rel. Catena v. Elias, 449 F.2d 40, 45 (3d Cir. 1971) (Seitz, C.J., concurring), *rev'd,* 406 U.S. 952 (1972).