**STATE OF HAWAII**, Respondent–Appellee, v. **FERDINAND Q. QUINO**, Petitioner–Appellant, and **HENRY TUGCAY GALINATO** and **RAUL CENTORNA CACHOLA**, Defendants

NO. 15239

(CR. NO. 90–0721)

OCTOBER 28, 1992

LUM, C.J., MOON, KLEIN, LEVINSON, JJ.,
AND RETIRED JUSTICE HAYASHI,
ASSIGNED BY REASON OF VACANCY

## OPINION OF THE COURT BY KLEIN, J.

Defendant–Appellant Ferdinand Q. Quino (Quino) was convicted of promoting a dangerous drug in the first degree in violation of Hawaii Revised Statutes (HRS) § 712–1241(1)(a)(i) (Supp. 1991). The circuit court denied Quino's pre–trial motion to suppress evidence. Subsequently, Quino was found guilty by a circuit court jury and sentenced to incarceration for a term of twenty years. On appeal before the Intermediate Court of Appeals (ICA), Quino argued that the circuit court should have granted his motion to suppress, because the evidence recovered was the product of an illegal seizure. The ICA affirmed the conviction in a published opinion. *See State v. Quino*, No. 15239 (Haw. App. May 7, 1992). This court granted Quino's petition for a writ of certiorari to review the ICA's opinion.

Quino's petition raises five issues; however, we confine our review to the following points: (1) whether Quino was "seized" by the police when Officer Tanya Tano (Officer Tano) approached and questioned him in the airport terminal; and (2) assuming a seizure occurred, whether it was consensual. Because we conclude that an unlawful seizure occurred prior to Quino's flight, it is unnecessary to address the remaining issues.[1]

### I.

The Honolulu Police Department's Narcotics/Vice Airport Detail (HPD) utilizes a "walk and talk" drug inter-

---

[1] The third point raised on appeal was whether Officer Tano had reasonable suspicion to believe that criminality was afoot prior to detaining Quino. The record is undisputed that when Officer Tano approached and questioned Quino, she had neither probable cause nor reasonable suspicion to detain him. Therefore, we decline to address

diction program in order to arrest drug smugglers and to seize any narcotics they might be carrying on their persons or in their luggage. This "walk and talk" program does not employ any type of "drug courier profile" or require the officers to have a reasonable suspicion that a person may be in possession of illegal drugs, or may be engaged in criminal activity. Instead, members of the detail are trained to engage in "consensual encounters" whereby airline passengers are approached and, in a "conversational manner," requested to consent to a search of their luggage or person.[2]

The HPD trains its officers to approach a passenger in the following manner: (1) the officer first observes passengers arriving from an illegal drug "source city"; (2) the officer then approaches a passenger at random and identifies himself as a police officer; (3) the officer asks the passenger if he would agree to talk to him; (4) the officer then asks whether the passenger has disembarked from the targeted flight; (5) after receiving oral affirmation, the officer asks the passenger for his identification and airline ticket; (6) the officer asks the passenger if he is carrying any narcotics; (7) upon receiving a negative answer, the officer requests "consent" to search the passenger's carry–on and check–in luggage; and, (8) if the inspection is fruitless, the officer then asks the passenger whether he has

---

this issue. Point four concerns whether Quino was "seized" when the police officers pursued him as he ran through the airport terminal. Point five questions whether Quino had a reasonable expectation of privacy in the contraband he abandoned while fleeing the police officers.

[2] Officer Tano testified at the suppression hearing that, "[t]here is no specific characteristic that I look for. It's just a matter of something causes you to look there and you watch."

any narcotics on his person and requests "consent" to pat down the passenger.

On the evening of April 3, 1990, Officers Tano and Harold Sumaoang (Officer Sumaoang) were assigned to observe passengers arriving on an American Airlines flight from San Jose.[3]  Quino and two friends, Henry Galinato (Galinato) and Raul Cachola (Cachola), were observed by the two officers as they exited the gate and walked single file along the concourse.  Officer Tano noticed an unnatural bulge or "bumpiness" on Galinato's back, near his beltline.[4]  She did not notice anything unusual about Quino or Cachola.

After observing the three men from a distance, both officers approached and stopped them.  Officer Tano identified herself as a police officer and asked permission to speak with Quino and Cachola.  After they agreed, Officer Tano asked them whether they had just arrived on the American Airlines flight from San Jose; whether they had previously been to Hawaii, whether they would mind if she looked at their airline tickets, and whether they would provide identification.  Meanwhile, Officer Sumaoang stopped Galinato and asked him similar questions.

Although Officer Tano identified herself as a police officer when she approached the men, she did not attempt to explain the purpose of the questioning.  However, while she was inspecting the airline tickets, Quino asked her what the inquiry was all about.  It was only then that

---

[3] This particular flight was being monitored because HPD classified San Jose as a "source city" through prior experience and information. The record is not clear regarding the flight's country of origin.

[4] At the preliminary hearing, Officer Sumaoang was asked whether he suspected any criminality was afoot when he saw Galinato's clothing.  He replied, "No."

Officer Tano mentioned that she was investigating possible narcotics trafficking at the airport.

Officer Tano then asked if the men were carrying narcotics. Quino said he knew nothing about narcotics. Nevertheless, Officer Tano asked if she could check Quino and Cachola's carry–on luggage. Quino obliged and showed Officer Tano the contents of his bag. No narcotics were discovered.

At that point, Officer Tano had no reasonable suspicion that any of the individuals was carrying contraband. Nevertheless, the possibility that she might be talking to drug couriers occurred to Officer Tano because of the "body language" exhibited by both men. She testified that, "I didn't have any indication, but I was starting to get, by their actions, I was beginning to think that they might have something." She, therefore, continued to "interact" with Quino and Cachola.

After Officer Tano looked into Cachola's bag, she asked if either Cachola or Quino was carrying narcotics on their person. Each responded in the negative. She then asked if she could "pat them down" and they said "no." Around that time, Officer Tano overheard Galinato say to Officer Sumaoang, "Give me a break." Immediately thereafter, the three men started running down the corridor with the officers in pursuit.

During the chase, Officer Sumaoang observed Galinato pull a waistband–like belt and yellow and white packages from under his shirt. Galinato threw these items into potted plants as he ran towards the main airport terminal. The packages were later determined to contain illegal drugs. Officer Sumaoang also observed Quino drop a cellophane package into a potted plant as he ran. This package was later found to contain illegal drugs.

Defendants Cachola, Galinato, and Quino were eventually arrested and charged with promoting a dangerous drug in the first degree. Galinato and Quino both filed pre–trial motions to suppress the evidence recovered during the chase at the airport. Consolidated hearings on the motions to suppress were held on August 15, September 21, and November 2, 1990. The motions were denied because the circuit court determined that the officers' initial approach and questioning were within constitutional bounds.

On January 2, 1991, Quino and Galinato were convicted of the drug charge.[5] They separately appealed, and although the ICA affirmed both convictions, only Quino requested certiorari.[6]

## II.
## A.

The ICA determined that Quino was not seized because: (1) the police officers' actions were lawful and would not have caused a reasonable person in Quino's position to believe that he was not free to leave, or that, if he started to leave, the police would attempt to physically restrain him; (2) Quino did not have the right to be advised that he could refuse to respond to the questions and simply leave the area; and (3) the circuit court's findings and legal conclusions were correct.[7]

---

[5] Apparently, Cachola was notified of his trial date and failed to appear in court or remain in contact with his attorney.

[6] Galinato submitted a motion for leave to join application for writ of certiorari in *State v. Quino*, No. 15239. However, on June 4, 1992, his motion was denied because it was untimely filed.

[7] The circuit court found that the officers: (1) did nothing by word and/or action to order Quino to do anything or not to do anything; (2)

Quino, however, argues that Officer Tano's approach and questioning of him at the airport was an unlawful and nonconsensual seizure of his person in violation of both the Fourth Amendment of the United States Constitution[8] and article I, section 7 of the Hawaii Constitution.[9] Although no physical force was used, Quino argues that the officers' show of authority and conduct communicated to him that he was not free to leave. He further contends that the incriminating evidence obtained after he fled was inadmissible as the product of an illegal seizure. We agree.

1.

In *Terry v. Ohio*, 392 U.S. 1, 16 (1968), the United States Supreme Court recognized that a brief detention that falls short of a traditional arrest may constitute a "seizure" within the meaning of the fourth amendment. The Court held that a seizure occurs when a police officer has in some way restrained the liberty of a citizen by means of physical force or a show of authority. *Id.* at 19

---

requested and obtained permission to do what they did; and (3) did not physically restrain Quino.

[8] The fourth amendment of the United States Constitution provides:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[9] Article I, section 7 of the Hawaii Constitution (emphasis added) provides:
   The *right of the people to be secure in their persons,* houses, papers and effects *against unreasonable searches, seizures and invasions of privacy shall not be violated*; and no

n.16. In addition, the Court held that in order to justify the intrusion upon an individual's constitutionally protected interests, the police officer must observe unusual conduct which leads him reasonably to conclude, in light of his experience, that criminal activity may be afoot and that "the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous . . . ." *Id.* at 24. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Id.* at 22.

More than a decade later in ***United States v. Mendenhall***, 446 U.S. 544 (1980), the Court established the principle that a person is seized "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. The test focused on whether the person questioned "remains free to disregard the questions and walk away." *Id.* If the person is able to do so, then there is no violation of his or her constitutional rights. *Id.*; *see also* ***Michigan v. Chesternut***, 486 U.S. 567 (1988).

However, in ***California v. Hodari D.***, 499 U.S. 621, 626–28, 111 S. Ct. 1547, 1550–51 (1991), the Court departed from previous case law by refusing to adhere to the reasonable person standard established in *Mendenhall*. The Court purported to rely on the common law definition of arrest when it held that a seizure within the

---

warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

meaning of the fourth amendment requires either physical force or submission to an assertion of authority. *Id.*

In analyzing seizures under article I, section 7 of the Hawaii Constitution, this court has utilized the *Mendenhall* standard. In *State v. Tsukiyama*, 56 Haw. 8, 12, 525 P.2d 1099, 1102 (1974), we stated that "[i]n order to determine if the defendant's liberty was restrained and he was, therefore, seized, we must evaluate the totality of the circumstances and decide whether or not a reasonably prudent person would believe he was free to go."

In *State v. Texeira*, 50 Haw. 138, 142 n.2, 433 P.2d 593, 597 n.2 (1967), we acknowledged that "[a]s long as we afford defendants the minimum protection required by federal interpretations of the Fourteenth Amendment to the Federal Constitution, we are unrestricted in interpreting the constitution of this state to afford greater protection." Thus, we decline to adopt the definition of seizure employed by the United States Supreme Court in *Hodari D.* and, instead, choose to afford greater protection to our citizens by maintaining the *Mendenhall* standard.

2.

Relying on *Mendenhall*, Quino argues that a reasonable person under the circumstances would have concluded that he was not "free to leave" during the police–initiated encounter. The State argues that *Tsukiyama* supports its proposition that no seizure of Quino occurred because the questioning here was similar to the "field interrogation" discussed in *Tsukiyama*. There, we determined that the "field interrogation" was not an unconstitutional detention because it did not deprive Tsukiyama of his freedom to move. *Tsukiyama*, 56 Haw. at 14, 525 P.2d at 1103.

In *Tsukiyama*, a police officer on routine patrol late at night came upon three vehicles parked on the street. A group of men was standing around one of the vehicles which had stalled. The officer called for backup and began to converse with Tsukiyama. In time, at least ten police officers arrived and parked around the three vehicles. *Id.* at 9, 525 P.2d at 1100–01. When one of the police officers asked Tsukiyama if he had any identification, Tsukiyama replied that it was in his glove compartment. *Id.* at 10, 525 P.2d at 1101. Without objecting, he proceeded to his vehicle. As two police officers shined their flashlights into his car, Tsukiyama opened the glove compartment, and the butt of a gun was revealed. *Id.* at 11, 525 P.2d at 1101. Recovery of the gun led to the discovery of narcotics in the glove compartment and Tsukiyama was arrested. *Id.*

Prior to trial, Tsukiyama's motion to suppress the evidence was denied by the circuit court. *Id.* On appeal, Tsukiyama alleged that the motion to suppress had been improperly denied because he had been unconstitutionally seized prior to the officer observing the gun in the glove compartment. *Id.* at 11, 525 P.2d at 1101–02. We affirmed Tsukiyama's conviction and held that no "stop" or "seizure" had taken place. *Id.* at 17, 525 P.2d at 1105. We found the "field interrogation" permissible because, given the totality of the circumstances, the officers had not restricted Tsukiyama's right to move. *Id.* at 14, 525 P.2d at 1103. We also found nothing in the record to show that Tsukiyama had been coerced into cooperating with the officer. *Id.* at 16–17, 525 P.2d at 1105.

Quino's situation differs substantially from *Tsukiyama* because Officers Tano and Sumaoang deliberately initiated their encounter with Quino and his companions for the specific purpose of investigating possible

drug trafficking by them. Utilizing questions that gradually became more intrusive, the officers sought to bootstrap their investigation into discovery of possible criminal activity by the group. By contrast, the officers in *Tsukiyama* came upon the men by happenstance. The questions asked were general, non–intrusive and limited to a request for identification. No one in the group was under investigation for specific criminal activity until the gun was observed in the glove compartment.

The record establishes that Officer Tano initially approached Quino and the others by starting an apparently innocuous "voluntary conversation." This "voluntary conversation" soon evolved into an interrogation, as Officer Tano's questions grew more intrusive and accusatory in nature.[10] The questions were also pretextual, specifically designed to elicit responses that would either vindicate or implicate the men.

In a staged police–citizen encounter such as this, the police exercise complete control over the interaction. The course of the questioning and the insinuative nature of the questions are left entirely to the discretion of the officer. For example, even after Quino informed Officer Tano that he knew nothing about narcotics, she sought to inspect his carry–on bag. When she found nothing in the carry–on, Officer Tano continued her questioning. She requested a pat down search, although she lacked a single reason to suspect Quino was concealing contraband. Moreover, the circumstances beget an obligation by the citizen to reply to any and all questions, no matter how intrusive, lest the authorities deem one's conduct suspicious. Had Quino

---

[10] The type of questions posed to Quino and the others indicated that the officers hoped their encounter would ripen into a "discovery" that the men were carrying narcotics.

cooperated by producing his airline ticket and identification, but refused an inspection of his bags or a pat down search, the officer's suspicion would surely have been aroused. Thus, the police investigation is benefitted immensely by the pretextual stop and questioning process. Here, Officer Tano was able to observe Quino's body language and evaluate his responses. If Quino's behavior had provided an objective basis to suspect criminal activity, a *Terry* stop could have been effected.

Under these facts, we are persuaded that once the stop turned from general to inquisitive questioning, a reasonable person in Quino's position would not have believed that he was free to ignore the officer's inquiries and walk away. Although no physical force was used, given the totality of the circumstances, we hold that a seizure took place within the meaning of article I, section 7 of the Hawaii Constitution.

### B.

The United States Supreme Court has previously held that police questioning in an airport terminal may not be an unconstitutional seizure when there is consent. For example, in **Florida v. Royer**, 460 U.S. 491, 497 (1983) (plurality opinion), the court explained that:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

Similarly, in **Florida v. Bostick**, 501 U.S. __, 111 S. Ct. 2382, 2384 (1991), the Court held that "[t]he Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as the reasonable person would understand that he or she could refuse to cooperate."

The State argues that there was no constitutional violation under state and federal law because the encounter between Officer Tano and Quino was "consensual."[11] Quino, however, argues that he felt compelled to submit to Officer Tano's questions, and thus did not freely and voluntarily consent to a seizure of his person. He further contends that his alleged voluntary consent could not have been given because he was never informed that he did not have to cooperate with the officers.

Waiver of one's constitutional rights must be freely, voluntarily and intelligently undertaken. Furthermore, it is the government's burden to prove that the waiver was voluntary and uncoerced. See **State v. Pau'u**, 72 Haw. 505, 509, 824 P.2d 833, 835 (1992) (citations omitted). This court has previously held that an officer has no affirmative duty to inform a person approached for questioning that he is free to leave the encounter at any time; however, failure to inform is a factor to be considered in evaluating whether consent has been freely and voluntarily given. **Nakamoto v. Fasi**, 64 Haw. at 21, 635 P.2d at 951.

---

[11] Both state and federal law have recognized that one may consensually waive his constitutional right to be free from warrantless searches and seizures. See **Bostick**, 501 U.S. at __, 111 S. Ct. at 2389; **Schneckloth v. Bustamonte**, 412 U.S. 218 (1973); **State v. Pau'u**, 72 Haw. 505, 824 P.2d 833 (1992); **Nakamoto v. Fasi**, 64 Haw. 17, 635 P.2d 946 (1981).

Under the circumstances of this case, we conclude that Quino did not voluntarily and intelligently agree to be detained.  By approaching the group of men and failing to disclose that they were free to go at any time, the officers were concealing their *investigative* objective precisely to gain Quino's "consent."  We note that the officers did not volunteer information that they were investigating drug trafficking at the time they announced their office.  Consent, based upon such material nondisclosures, can hardly be viewed as either voluntary or intelligent.

Moreover, the State cannot rely on Quino's acquiescence to establish that he voluntarily consented to the seizure of his person.  *See Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968) (footnotes omitted) (Court held that the prosecution's burden of proving that consent was freely and voluntarily given cannot be discharged by showing no more than an acquiescence to a claim of lawful authority).  Here, Quino's submission to the officers' requests cannot be deemed consensual.  Because the State has failed to meet its burden of proof that consent was voluntary and uncoerced, we hold that Quino's seizure was unlawful.

## C.

We cannot allow the police to randomly "encounter" individuals without any objective basis for suspecting them of misconduct and then place them in a coercive environment in order to develop reasonable suspicion to justify their detention.  This investigative technique is based on the proposition that an otherwise innocent person, who comes under police scrutiny for no good reason, is not innocent unless he or she convinces the police that he or she is.  Such a procedure is anathema to our constitu-

tional freedoms. For these reasons, we hold that the police conduct violated Quino's right to be secure against unreasonable seizures guaranteed by article I, section 7 of the Hawaii Constitution.

Accordingly, we reverse Quino's conviction, order the evidence suppressed, and remand the case to circuit court for proceedings consistent with this opinion. Concurrently, we order depublication of the ICA opinion.

On the briefs:

*Theodore Y.H. Chinn*, Deputy Public Defender, for petitioner–appellant.

*Charlotte J. Duarte*, Deputy Prosecuting Attorney, for respondent–appellee.

## CONCURRING OPINION BY LEVINSON, J.

I enthusiastically concur in the holdings of the cogently reasoned majority opinion that a seizure took place in this case within the meaning of article I, section 7 of the Hawaii Constitution, that Quino was unlawfully seized without his consent, and that, on the record before us, the conduct of the police therefore violated article I, section 7 of the Hawaii Constitution. But in light of the surreal and Orwellian world of *Florida v. Royer*, 460 U.S. 491 (1983), *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547 (1991), and *Florida v. Bostick*, 501 U.S. ___, 111 S. Ct. 2382 (1991), in which the fourth amendment to the United States Constitution seems to have

atrophied to the condition of a vestigial organ, I believe that more needs to be said.

Article I, section 7 of the Hawaii Constitution[1] protects people from unreasonable government intrusions into their legitimate expectations of privacy. *State v. Clark*, 65 Haw. 488, 493, 654 P.2d 355, 359 (1982); *see also State v. Fields*, 67 Haw. 268, 282, 686 P.2d 1379, 1390 (1984). And, as "the ultimate judicial tribunal in this state," this court has final, unreviewable authority to interpret and enforce the Hawaii Constitution. *Fields*, 67 Haw. at 282, 686 P.2d at 1390.[2] " 'The basic purpose . . . [of these constitutional provisions] is to safeguard the

---

[1] Article I, section 7 of the Hawaii Constitution provides:

> The right of the people to be *secure in their persons*, houses, papers and effects *against unreasonable* searches, *seizures and invasions of privacy* shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched *and the persons* or things *to be seized* or the communications sought to be intercepted.

(Emphasis added.) The words "invasions of privacy" were added to article I, section 7 by the 1968 Constitutional Convention. *State v. Roy*, 54 Haw. 513, 518, 510 P.2d 1066, 1069 (1973) (Levinson, J., concurring). The Convention's Standing Committee Report No. 55 stated: "The proposed amendment is intended to include protection against indiscriminate wire–tapping *as well as undue government inquiry into and regulation of those areas of a person's life which is [sic] defined as necessary to insure 'man's individuality and human dignity.'* " *Id.* (Emphasis added.)

[2] In *State v. Texeira*, 50 Haw. 138, 142 n.2, 433 P.2d 593, 597 n.2 (1967), this court had the courage and foresight to forge the apparently revolutionary notion that "[a]s long as we afford defendants the minimum protection required by federal interpretations of the Fourteenth Amendment to the Federal Constitution, we are unrestricted in interpreting the constitution of this state to afford greater protection." We have adhered steadfastly to this principle. *See, e.g., State v. Grahovac*, 52 Haw. 527, 531, 533, 480 P.2d 148, 151–52 (1971); *State*

privacy and security of individuals against arbitrary invasions by government officials.' ***Camara v. Municipal Court***, 387 U.S. 523, 528 (1967). The constitutional proscription . . . that the person and effects of an individuals [sic] are considered to be sacrosanct and may not be the object of unreasonable searches and seizures . . . draws no distinction in its application between an individual suspected of criminal activity and one who is not." ***Nakamoto v. Fasi***, 64 Haw. 17, 20, 635 P.2d 946, 950 (1981) (brackets in original). Thus, article I, section 7 of the Hawaii Constitution was "designed to protect the individual from arbitrary, oppressive, and harassing conduct on the part of government officials." ***Fasi***, 64 Haw. at 23, 635 P.2d at 952.

In ***State v. Melear***, 63 Haw. 488, 630 P.2d 619 (1981), this court delineated the circumstances under which the police may properly conduct an investigative stop of an individual:

> It is well established that a law enforcement officer may "in appropriate circumstances and in [an] appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." ***Terry v. Ohio***, 392 U.S. 1, 22

---

*v. Santiago*, 53 Haw. 254, 265–66, 492 P.2d 657, 664 (1971); *State v. Kaluna*, 55 Haw. 361, 367–69, 372–75, 520 P.2d 51, 57–58, 60–62 (1974); *State v. Manzo*, 58 Haw. 440, 452, 573 P.2d 945, 953 (1977); *State v. Miyasaki*, 62 Haw. 269, 280–82, 614 P.2d 915, 921–23 (1980); *Huihui v. Shimoda*, 64 Haw. 527, 531, 644 P.2d 968, 971 (1982); *State v. Fields*, 67 Haw. 268, 282, 686 P.2d 1379, 1390 (1984); *State v. Wyatt*, 67 Haw. 293, 304 n.9, 687 P.2d 544, 552 n.9 (1984); *State v. Tanaka*, 67 Haw. 658, 661–62, 701 P.2d 1274, 1276 (1985); *State v. Kim*, 68 Haw. 286, 289–90, 711 P.2d 1291, 1293–94 (1985); *State v. Kam*, 69 Haw. 483, 491, 748 P.2d 372, 377 (1988).

(1968); *State v. Barnes*, 58 Haw. 333, 337, 568 P.2d 1207, 1211 (1977). We stated in *State v. Barnes*, *supra*, at 338, 568 P.2d at 1211:

> To justify an investigative stop, short of an arrest based on probable cause, "the police officer must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion." The ultimate test in these situations [is] whether [] a man of reasonable caution would be warranted in *believing that criminal activity was afoot* and that the action taken was appropriate. (Citations omitted.)

63 Haw. at 493, 630 P.2d at 624 (emphasis added).

It is precisely because article I, section 7 of the Hawaii Constitution was designed, among other things, " 'to safeguard the privacy . . . of individuals against arbitrary invasions' " and "arbitrary, oppressive, and harassing conduct" by the police, *Fasi*, 64 Haw. at 20, 23, 635 P.2d at 950, 952, that we have conditioned an investigative stop on the police officer's capacity " 'to point to specific and articulable facts . . .' [warranting a reasonable belief] that criminal activity [is] afoot." *Melear*, 63 Haw. at 493, 630 P.2d at 624. To require otherwise would be to invite the very sort of "staged" and "pretextual" police–citizen encounter that occurred in the present case and that the majority has described and disapproved so eloquently. Such charades do indeed permit the police to seize individuals, *see* *Terry v. Ohio*, 392 U.S. 1, 16 (1968), at random and require them to convince the officers of their innocence of wrongdoing. They also potentially permit the

police to sanitize an unlawful, suspicionless "encounter" by construing the subject's non–cooperation as "suspicious" or "flight" and then claiming "probable cause" to arrest. *Cf. Melear*, 63 Haw. at 494, 630 P.2d at 625; *Sibron v. New York*, 392 U.S. 40, 66–67 (1968).

I agree with the majority that such a state of affairs "is anathema to our constitutional freedoms." According to the United States Supreme Court, the fourth amendment to the United States Constitution may not be offended, *see, e.g., Florida v. Bostick*, 501 U.S. at ___, 111 S. Ct. at 2384, 2386, but, in my view, article I, section 7 of the Hawaii Constitution certainly is.