218 P.3d 749

STATE of Hawai'i, Respondent/Plaintiff–Appellee,

v.

Jon Curtis ESTABILLIO, Petitioner/Defendant–Appellant.

No. 28950.

Supreme Court of Hawai'i.

Oct. 26, 2009.

262

Phyllis J. Hironaka, Deputy Public Defender, for petitioner/defendant-appellant.

Jason M. Skier, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

MOON, C.J., NAKAYAMA, ACOBA, and DUFFY, JJ., and Circuit Judge McKENNA, in place of RECKTENWALD, J., Recused.

Opinion of the Court by MOON, C.J.

On July 31, 2009, this court accepted a timely application for a writ of certiorari, filed by petitioner/defendant-appellant Jon Curtis Estabillio, Jr. on June 23, 2009, requesting that this court review the Intermediate Court of Appeals' (ICA) March 26, 2009 judgment on appeal, entered pursuant to its March 13, 2009 memorandum opinion (mem. op.), 2009 WL 685655. Therein, the ICA affirmed the Circuit Court of the Third Circuit's [1] December 28, 2007 judgment, convicting Estabillio of, and sentencing him for,—pursuant to his conditional guilty plea—attempted promoting a dangerous drug in the first degree, in violation of Hawai'i Revised Statutes (HRS) §§ 705–500(1)(b) (1993) [2] and 712–1242(1)(c) (Supp.2008). [3] Oral argument was held on September 17, 2009.

Briefly stated, Estabillio was initially stopped for a traffic offense that eventually

---

1. The Honorable Glenn S. Hara presided.

2. HRS § 705–500(1)(b) provides that: "A person is guilty of an attempt to commit a crime if the person ... [i]ntentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime."

3. HRS § 712–1241 provides in relevant part that:

(1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:

. . . .

. (b) Distributes, except for methamphetamine:

. . . .

(ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of:

led to the discovery of drugs on his person and in his vehicle. Estabillio moved to have, *inter alia,* the drug evidence suppressed on the grounds that the traffic stop was pretextual and that he was subject to an illegal continued detention, which the circuit court denied. Thereafter, Estabillio entered a conditional guilty plea pursuant to a plea agreement with respondent/plaintiff-appellee State of Hawaiʻi (the prosecution) and appealed. The ICA affirmed, relying on this court's decision in *State v. Barros,* 98 Hawaiʻi 337, 48 P.3d 584 (2002) (holding that an officer was not prohibited under the constitution from requesting a warrant check in a traffic stop when the check did not prolong the length of time needed to issue the traffic citation).

On application, Estabillio argues, *inter alia,* that the evidence recovered should have been suppressed because it was obtained in violation of article I, section 7 of the Hawaiʻi Constitution. More specifically, Estabillio asks:

> Whether the ICA gravely erred, in violation of Estabillio's rights against unreasonable search, seizure and invasions of privacy ... by affirming the [circuit] court's denial of his motion to suppress, ignoring undisputed evidence that the stop was pretextual, that the traffic violations investigation had ceased, and that no reasonable suspicion existed to investigate Estabillio for drugs.

As discussed more fully *infra,* we hold that the ICA erred in affirming the circuit court's denial of Estabillio's motion to suppress. Accordingly, we reverse (1) the ICA's March 25, 2009 judgment on appeal and (2) the trial court's (a) December 28, 2007 judgment of conviction and sentence, entered *nunc pro tunc* to December 14, 2007, and (b) August 31, 2007 denial of Estabillio's motion to suppress.

## I. *BACKGROUND*

### A. *Procedural and Factual Background*

On January 9, 2006, Estabillio was charged—via complaint—with, *inter alia:* (1)

(A) One-eighth ounce or more, containing heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers; or

attempted promoting a dangerous drug in the first degree, in violation of HRS §§ 705–500(1)(b) and 712–1242(1)(c). On December 28, 2006, Estabillio filed a motion to suppress all the evidence that served as the basis for, *inter alia,* the drug offense, arguing that it was unconstitutionally recovered from him based on a warrantless seizure of both his person and his property. The prosecution opposed Estabillio's motion to suppress.

On July 20, and August 31, 2007, a hearing was held on Estabillio's motion. The following witnesses were called by Estabillio to testify regarding the events that occurred on January 5, 2006, which resulted in the recovery of the evidence that Estabillio sought to suppress. The prosecution did not call any witnesses.

### 1. **Officer Robert Pauole**

Hawaiʻi County Police Department (HCPD) officer Robert Pauole (Officer Pauole)—a traffic enforcement officer—testified that, on January 5, 2006 at around 8:00 p.m., he was contacted by HCPD officer Brian Prudencio—an officer with the "vice squad" [hereinafter, Vice–Officer Prudencio]—via cell phone, requesting Officer Pauole's assistance with a traffic stop of Estabillio. Vice–Officer Prudencio provided Officer Pauole with basic information about Estabillio including, "who he was, date of birth, ... the description of the car[,] and where ... [his] car would be." More specifically, Officer Pauole testified that Vice–Officer Prudencio informed him that Estabillio was at Puainako Town Center, driving a 1993 green Honda sedan and that the weight tax emblem [hereinafter, registration sticker] for the vehicle was expired. According to Officer Pauole, Vice–Officer Prudencio also informed Officer Pauole that he believed that there were "drugs in the car." Officer Pauole indicated that it was his understanding that he was being asked to stop Estabillio's vehicle to assist Vice–Officer Prudencio

(B) Three-eighths ounce or more, containing any other dangerous drug[.]

in his investigation of Estabillio because vice squad officers did not equip their vehicles with "blue light[s] and siren[s]." Officer Pauole also indicated that it was his understanding that "the plan was for [him] to stop [Estabillio], and then [the vice officers] would appear and conduct their investigation."

Officer Pauole testified that he then located Estabillio exiting the Puainako Town Center, heading southbound in the Puna direction. He pulled in behind Estabillio and observed that the registration sticker on Estabillio's vehicle was current. Officer Pauole radioed dispatch and requested information to verify whether Estabillio's vehicle registration was expired—as Vice–Officer Prudencio had informed him—or if it was, in fact, valid as reflected by the current sticker. Dispatch informed Officer Pauole that Estabillio's vehicle registration was expired.

Officer Pauole testified that he continued to follow Estabillio and stopped behind him at a stop light at the intersection of Kawailani Street and Kilauea. Officer Pauole stated that, as the light turned green, Estabillio accelerated rapidly. Officer Puaole clocked his acceleration and determined that Estabillio "obtained a speed of [fifty] miles an hour" in a posted thirty-five miles per hour speed zone. Officer Pauole indicated that he then radioed central dispatch to notify them that he intended to make a traffic stop on Estabillio's vehicle and initiated the stop with the "use of [his] strobe lights and burst of a siren." Estabillio stopped and pulled into a private driveway. Once Estabillio stopped, Officer Pauole pulled in directly behind Estabillio, blocking him from exiting the driveway, and observed that there was one passenger in Estabillio's vehicle (later identified as Aaron Castro). Officer Pauole testified that, at that point, Estabillio was not free to leave the scene and was being detained for the traffic violation, i.e., speeding.

Upon exiting his vehicle and approaching Estabillio, Officer Pauole informed Estabillio that he had stopped him because of the speeding infraction, as well as the vehicle registration discrepancy. Officer Pauole testified that he asked Estabillio for his "license, registration, [and] insurance," which is standard procedure for a traffic stop, but that Estabillio was only able to provide him with a driver's license. Officer Pauole stated that, while he was still speaking with Estabillio, the vice squad officers arrived at the scene. After obtaining Estabillio's driver's license and information, Officer Pauole indicated that he returned to his vehicle to run a warrant check on Estabillio and determined there were none. He also testified that he did not begin writing the traffic citations because "the vice officers had already arrived on [the] scene." Officer Pauole further testified as follows:

Q. [By Estabillio's counsel] Now, normally[,] once citations like these are issued[,] is the offender allowed to leave the scene, or is he arrested and taken into custody?

. . . .

A. [By Officer Pauole] If I just give citations then they're free to leave after the citation.

Q. Okay. You hand them the ticket and they can leave?

A. Yes.

Q. In this case[,] did you ever issue citations for . . . Estabillio?

A. No.

Q. Now, while you were at the scene[,] did you participate at—in the investigation after leaving . . . Estabillio with the arrival of [Vice–Officer] Prudencio?

A. Uh, once [Vice–Officer] Prudencio arrived on scene I just stood by my car and I waited.

Q. Did—were you, uh, did you observe what was going on in the—in the, uh, encounter between [Vice–Officer] Prudencio, the other officers, and . . . Estabillio?

A. Yes, I was watching what they were doing.

Q. Now, did [Vice-]Officer Prudencio ask you to conduct any further investigation in this case?

A. No.

Q. Now, if it was your, uh, responsibility or assignment that day to conduct the traffic stop, why were you not actively participating in the investigation of . . . Estabillio's traffic tickets?

A. It was my assumption that he was gonna be arrested, um, and normally when they are arrested for other things they add on the, uh, infractions to the arrest.

Q. Is it your understanding that after your stop of the car you—well, let me withdraw that. You indicated that your understanding was that he was going to be arrested and, therefore, these traffic tickets would be added on?

A. Yes. They would be part of the arrest.

Q. You yourself did not issue or effect any arrest—

A. No.

When asked about how long it would have taken him to issue the traffic citations, Officer Pauole indicated that it would depend on whether they were using the "old citations or new citations." According to Officer Pauole, the "old" citations would have taken "maybe twenty minutes"; the "new" citations "maybe fifteen [minutes] or less."

On cross-examination, Officer Pauole testified that, during an investigation for a fraudulent vehicle registration sticker, the sticker that is attached to the vehicle is recovered as evidence by scraping it off the vehicle with a razor blade. Officer Pauole indicated that removing the sticker usually takes a few minutes.

## 2. Vice–Officer Brian Prudencio

Vice–Officer Prudencio—a seven-year veteran of the HCPD—testified that, on January 5, 2006, he was working in the "vice unit" of the HCPD. He confirmed Officer Pauole's account of their conversation "regarding a traffic violation" related to Estabillio. He also confirmed advising Officer Pauole that Estabillio was the target of a drug investigation and that, if Officer Pauole "were to effect a traffic stop," Vice–Officer Prudencio "should be notified."

According to Vice–Officer Prudencio, he left the Pauinako Town Center after talking with Officer Pauole and drove around the area, monitoring the police radio transmissions. About five or ten minutes later, he heard over the radio that Estabillio had been stopped by Officer Pauole and, therefore, proceeded to the location of the stop. Vice–Officer Prudencio testified that he arrived at the scene with two other officers. He indicated that a third officer, Kenneth Quiocho (Vice–Officer Quiocho)—along with his narcotics canine (Nalu)—"was parked down the road waiting for [Vice–Officer Prudencio] ... to call him on [his] cell phone." Vice–Officer Prudencio also indicated that he proceeded to the scene of the traffic stop in order to investigate Estabillio for possible drug dealing, not for the traffic offenses.

Vice–Officer Prudencio testified that, upon arriving at the scene, he approached Estabillio and did not see him in possession of any illegal drugs. He stated that he questioned Estabillio about certain traffic violations and then began to talk to him about drug dealing, using words to the effect that he (Vice–Officer Prudencio) "had received information from a confidential informant saying that [Estabillio] was a mid-level cocaine dealer." He asked Estabillio to consent to a search of the vehicle, but Estabillio refused and requested to speak with an attorney. Vice–Officer Prudencio testified that he did not allow Estabillio to contact counsel nor did he advise him of his Miranda rights. Based on Estabillio's refusal to consent to a search of his vehicle, Vice–Officer Prudencio called Vice–Officer Quiocho, requesting that he bring Nalu to the scene to conduct a scan of Estabillio's vehicle and that "[Vice-]Officer Quiocho arrived at the scene shorter than 10 to 15 minutes [sic]."

According to Vice–Officer Prudencio, Nalu commenced a scan of Estabillio's vehicle and alerted them to the presence of a controlled substance in the car. Thereafter, Estabillio was arrested for "promotion of a dangerous drug in the third degree" and subsequently subjected to a "pat-down search of his person," which search uncovered, *inter alia*, a closed container in one of the Estabillio's pockets.[4] Vice–Officer Prudencio applied for

---

4. More specifically, the container was:

A blue colored plastic container, approximately three inches wide, four inches tall, and one-half inch thick, with a black nylon string attached to the top flip cover, having a black latch on one side and having a white colored T

and received two search warrants—one for the container recovered from Estabillio's person and one for Estabillio's vehicle.[5]

On cross-examination, Vice–Officer Prudencio estimated that he arrived at the scene about a minute or two after Officer Pauole effectuated the traffic stop and that Nalu alerted the officers as to the presence of drugs approximately ten minutes after Vice–Officer Prudencio arrived on the scene. He also testified that he never told Officer Pauole to stop investigating the traffic citations and, to the best of his knowledge, Officer Pauole continued to investigate the traffic citations up until the time the canine screening occurred. In Vice–Officer Prudencio's estimation, writing a citation for each traffic offense might take ten to fifteen minutes with an additional minute or two to scrape off the allegedly fraudulent vehicle registration sticker.

### 3. Jon Curtis Estabillio, Jr.

Estabillio testified that, on January 5, 2006, he was getting food at Ling's in Pauinako Town Center with some friends, including Aaron Castro, the passenger in Estabillio's vehicle. After leaving Ling's, Estabillio stated that he sped out from the intersection on Kawailani and Kilauea and was then pulled over by Officer Pauole. Estabillio did not get out of the vehicle, and Officer Pauole approached him as he sat in the car. Estabillio indicated that he did not feel free to leave the scene. He also indicated that Officer Pauole told him that he was speeding and asked him for his driver's license, registration, and insurance card, but that he was only able to provide his license.

Estabillio testified that, after Officer Pauole returned to his car, two other officers arrived at the scene and that Vice–Officer Prudencio approached the driver's side door while the other officer approached the passenger side door. Vice–Officer Prudencio instructed Estabillio and Castro to "keep [their] hands up" on the steering wheel and the dashboard, respectively. Estabillio stat-

ed that, at the time Vice–Officer Prudencio approached his car, there was no contraband visible.

According to Estabillio, Vice–Officer Prudencio told him that they were "going [to] search [his] car for drugs" because Estabillio "was known to sell drugs." Estabillio testified that he responded that, "before they search my car[,] I like one attorney be here or talk to an attorney," but Vice–Officer Prudencio did not respond and no attorney was contacted. Estabillio was then advised that, if he refused to consent to the search of the car, "they would bring the dog to smell the car and stuff." Estabillio still refused to allow the HCPD to search his car.

Estabillio testified that Nalu then arrived at the scene; however, he was unsure how much time had passed since the initial traffic stop. The HCPD proceeded to do a "canine screen" while Estabillio was still seated in the car with his hands on the steering wheel. After Nalu screened the car, Estabillio stated that Vice–Officer Prudencio "told [him] that the dog [had] detected there was [sic] drugs" and to step out of the car because they were going to arrest him. Estabillio testified that he stepped out of the car, put his hands on the roof of the car (as ordered by the officers), and was subjected to a pat-down search. After the search, Estabillio was handcuffed and placed under arrest. Estabillio testified that he was then transported to the Hilo police station. The following day—after being advised of his rights (i.e., Miranda warnings), which he waived,—Estabillio gave a statement to Vice–Officer Prudencio regarding the drug evidence recovered after his arrest. On cross-examination, Estabillio admitted that he was speeding and that he had used cocaine on the day in question.

In closing, Estabillio argued that—pursuant to, *inter alia, State v. Perez*, 111 Hawai'i 392, 141 P.3d 1039 (2006), discussed *infra*,— the evidence seized subsequent to Estabillio's traffic stop should be suppressed because

---

& C Surf Designs Hawaii emblem on the front[.]

5. According to the police reports (marked for identification and made a part of the record on

appeal), 2.4 grams of cocaine were recovered from the container and 14.7 grams of cocaine were recovered from the trunk of Estabillio's vehicle.

Officer Pauole surrendered his investigation to Vice–Officer Prudencio and that the prosecution had shown no "probable cause to independently detain him" for the purpose of conducting an inquiry into drug dealing. Conversely, the prosecution contended that the evidence was properly seized inasmuch as the investigation for the traffic stop was ongoing at the time the canine screen was conducted as evinced by the fact that "the fraudulent [registration] sticker had not been removed." Additionally, the prosecution argued that it was not unconstitutional for the police, "while somebody's being independently detained[,] ... [to] talk to him about another investigation they have going."

■ At the close of the hearing, the circuit court issued its oral ruling, stating that:

Unlike the way in which the lawyers and the [courts] like to look at the real world in terms of very linear time lines, life does not happen that way. And in reality, there are a number of things that are happening, and what we try to do when we report them is to report them separately and maybe integrate them later on. And that's maybe not the most accurate way of trying to relate what may be the facts, the legally submitted facts of what went on.

In this particular case, I think the question is one of, uh, the fourth amendment rights of ... Estabillio in terms of his reasonable expectation of privacy. And after he had been stopped by Officer Pa[u]ole, I don't think that there's any question about the initial stop having been legitimate for reasons of traffic violations, whether or not the continued detention of ... Estabillio, uh, and the intrusion of his rights, uh, to remain free from detention

was unreasonable, and under the circumstances the [circuit c]ourt will find that it is not.

There was a continuing investigation for traffic offenses at the time—the times involved, even though there may be some discrepancies in terms of the, uh, length of time involved and the, perhaps the, uh, sequence in which certain events occurred I think is all within a reasonable time to conduct a traffic stop. And all of what happened with respect to the, um, canine screen was within the time to reasonably conduct a traffic stop and conduct a traffic investigation and to have issued citations. Um, the law is basically, with respect to pretext stops, that the—if there is a valid legal basis for the, uh, intrusions for the stop for the arrest or search, um, that even though there may be, uh, possibilities of ulterior motives by the police that that's not going to be a reason to taint the search or the stop.

So the [circuit c]ourt's going to deny the motion to suppress.

The circuit court did not issue any written findings of fact (FOFs), conclusions of law (COLs), or a written order denying Estabillio's motion to suppress.[6]

On September 17, 2007, Estabillio entered a conditional plea of guilty, pursuant to HRPP Rule 11(a)(2) (2009),[7] to the charge of attempted promoting a dangerous drug in the first degree, based upon a plea agreement with the prosecution, wherein the prosecution agreed to, *inter alia*, dismiss the remaining charges in exchange for Estabil-

---

6. Although the circuit court did not file a written order confirming its oral denial of Estabillio's motion, this court, in *State v. Kahoonei*, 83 Hawai'i 124, 126, 925 P.2d 294, 296 (1996), addressed the merits of an appeal challenging the circuit court's oral denial of a motion to suppress—despite the fact that no written FOFs, COLs, or order was entered—because the circuit court "indicated its essential findings on the record" in compliance with Hawai'i Rules of Penal Procedure (HRPP) Rule 12(e) (2009) (requiring that, "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record"). Here, the circuit court likewise complied with HRPP Rule

12(e) by stating its essential findings on the record. Thus, the circuit court's failure to file a written order denying the motion to suppress is not fatal to Estabillio's appeal.

7. HRPP Rule 11(a)(2) states:

With the approval of the court and the consent of the [prosecution], a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to seek review of the adverse determination of any specific pretrial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.

lio's guilty plea. The circuit court sentenced Estabillio on December 14, 2007.[8]

On December 28, 2007, the circuit court entered its judgment of conviction and sentence, *nunc pro tunc* to December 14, 2007. On January 11, 2008, Estabillio filed a timely notice of appeal.

### B. *Appeal Before the ICA*

On appeal, Estabillio argued, as he does in his application, that the circuit court erred in denying his motion to suppress in violation of his constitutional rights. Estabillio's primary argument centered around his belief that, "inasmuch as [Officer] Pauole ceased all efforts to investigate and conclude (*e.g.,* write out citations for) the traffic offenses the moment that [Vice–Officer] Prudencio and the [other] vice officers arrived and took over the investigation, the valid basis for the investigatory stop ended[,] and Estabillio's detention became unlawful." Estabillio pointed to this court's decision in *State v. Bolosan,* 78 Hawai'i 86, 92, 890 P.2d 673, 679 (1995), for the proposition that, "[t]o justify an investigative stop[,] short of an arrest based on probable cause, the police officer must be able to point to specific and articulable facts which, taken together with rational inference[s] from those facts, reasonably warrant that intrusion." Estabillio also argued that this court's decision in *Perez,* discussed *infra,* "involved circumstances that parallel[ed] Estabillio's." Additionally, Estabillio asserted that "the canine sniff far exceeded the scope of the traffic stop" because "it was completely unrelated to [Officer] Pauole's original reasonable suspicion of speeding/[registration sticker] violations." (Citing *State v. Kaleohano,* 99 Hawai'i 370, 56 P.3d 138 (2002)).

In response, the prosecution argued that the circuit court correctly denied Estabillio's motion to suppress. More specifically, the prosecution argued that Estabillio's detention was constitutionally reasonable because: (1) the "initial stop of Estabillio's vehicle was objectively valid"; (2) the "investigation for the traffic offenses was still underway when the narcotic canine alert occurred"; (3) "[Vice-]Officer Prudencio's investigation related to both the observed traffic violations as well as the narcotics violation"; and (4) "the time for the canine screen to be conducted did not exceed the time generally required to issue citations for the traffic offenses." Additionally, the prosecution expressed concern that

> Estabillio would have [the ICA] adopt a rule whether police would be unable to stop a vehicle for observed traffic violations when they also have suspicions of another crime. Under Estabillio's interpretation of the law, police would be unable to conduct an objectively valid DUI stop if police also suspected that same person of another crime for which they lacked reasonable suspicion. This would grant temporary immunity from traffic laws to those persons who are suspected of other crimes. This is an absurd result.

In sum, the prosecution urged the ICA to hold that, "[s]o long as the secondary investigation does not lengthen the time of detention for the traffic investigation, there is no logical reason to prohibit police from interacting with a suspect regarding an unrelated matter during a traffic investigation." [9]

The ICA held that the circuit court correctly denied Estabillio's motion to suppress. In its entirety, the ICA's analysis stated:

---

8. Although originally sentenced to a twenty-year term of imprisonment, Estabillio filed an HRPP Rule 35 (2009) motion to reduce his sentence. According to Estabillio, the motion was granted on June 26, 2008; however, the relevant documents were not made part of the current record on appeal. Thus, Estabillio's ultimate sentence is unknown.

9. The prosecution also argued on direct appeal that:

> As [Estabillio] did not have proper insurance for the vehicle, he had no legal means of removing the vehicle from the spot where the traffic stop occurred. As the violation in this case was (at least) his second offense, he [was] subject to the penalty provision of HRS § 431:10C–117(5)(a) [ (Supp.2008) ]. As he faced a possible jail sentence for the no-fault violation, police were within their powers to order [Estabillio] out of his vehicle and arrest him for that offense.

(Citing *State v. Vallesteros,* 84 Hawai'i 295, 297, 933 P.2d 632, 634 (1997)). The circuit court did not have the benefit of this argument because it was raised for the first time on appeal; thus, we decline to consider it.

In *State v. Barros*, 98 Hawai'i 337, 48 P.3d 584 (2002), the Hawai'i Supreme Court held that a warrant check conducted by a police officer who lawfully stopped Barros for jaywalking was not an unreasonable intrusion of Barros's constitutional right against unreasonable searches and seizures, because "[t]he warrant check was completed entirely within the time required for [the officer] to issue the citation." 98 Hawai'i at 342–43, 48 P.3d at 589–90.

In the instant case, it is undisputed that Officer Pauole lawfully stopped Estabillio for speeding and for a registration sticker discrepancy. Furthermore, the record establishes that the narcotics canine screen [3] was conducted simultaneously with the citation procedure and within the time required for Officer Pauole to issue the citations. Because the evidence in the record substantially demonstrates that the initial stop was lawful and the narcotics canine screen was conducted within the time reasonably required to conduct the traffic stop and issue the citations, the circuit court was not wrong in denying Estabillio's motion to suppress.

---

3 Estabillio had "no reasonable expectation of privacy in the airspace surrounding" his vehicle. *See State v. Groves*, 65 Haw. 104, 112, 649 P.2d 366, 371–72 (1982). Mem. op. at 5–6. Having affirmed Estabillio's conviction and sentence via memorandum opinion, filed March 13, 2009, the ICA filed its judgment on appeal on March 25, 2009. Thereafter, this court accepted Estabillio's application on July 31, 2009 and heard oral argument on September 17, 2009.

## II. *STANDARD OF REVIEW*

■■■ A [circuit] court's ruling on a motion to suppress evidence is reviewed *de* *novo* to determine whether the ruling was "right" or "wrong." *State v. Edwards*, 96 Hawai'i 224, 231, 30 P.3d 238, 245 (2001) (citing *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000)). The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution. *See State v. Wilson*, 92 Hawai'i 45, 48, 987 P.2d 268, 271 (1999) (citations omitted). *State v. Kaleohano*, 99 Hawai'i 370, 375, 56 P.3d 138, 143 (2002).

## III. *DISCUSSION*

■■■ As previously indicated, Estabillio primarily contends that the ICA erred in affirming the circuit court's denial of his motion to suppress inasmuch as the evidence against Estabillio was obtained "from the vice officers' illegal continued detention of Estabillio, after the valid traffic violations investigations had ceased and given way to the suspicionless drug investigation in violation of his rights to be free from unreasonable search, seizure, and invasions of privacy." [10] We begin our analysis with an overview of this jurisdiction's case law regarding investigatory detentions.

### A. *Hawai'i Law on Investigatory Detentions*

Article I, section 7 of the Hawai'i Constitution, states in relevant part that "[t]he right of the people to be secure in their persons . . . against unreasonable searches, seizures and invasions of privacy shall not be violated[.]" [11] We have previously stated that:

---

10. Estabillio also contends that his detention violated his "right to due process" and his "right to counsel." However, Estabillio fails to provide any argument regarding these alleged constitutional violations, and, thus, Estabillio waived these arguments under HRAP Rule 40.1(d)(4) (2009) (requiring an application for a writ of certiorari to contain "[a] brief argument with supporting authorities") and HRAP Rule 28(b)(7) (2009) (stating that "[p]oints not argued may be

deemed waived"). Accordingly, we do not address them further.

11. In this regard, Estabillio specifically states that he is bringing his claims under the Hawai'i Constitution and not the United States Constitution. Thus, although the Fourth Amendment to the United States Constitution also proscribes unreasonable searches and seizures, our analysis herein is limited to unconstitutional search and

A stop of a vehicle for an investigatory purpose constitutes a seizure within the meaning of the constitutional protection against unreasonable searches and seizures. *Kernan v. Tanaka*, 75 Haw. 1, 37, 856 P.2d 1207, 1225 (1993), *cert. denied*, 510 U.S. 1119[, 114 S.Ct. 1070, 127 L.Ed.2d 389] (1994).

In determining the reasonableness of wholly discretionary automobile stops, this court has repeatedly applied the standard set forth in *Terry v. Ohio*, 392 U.S. 1[, 88 S.Ct. 1868, 20 L.Ed.2d 889] (1968). *See State v. Bonds*, [59 Haw. 130, 577 P.2d 781 (1978) ]; *State v. Ogata*, 58 Haw. 514, 572 P.2d 1222 (1977); *State v. Barnes*, 58 Haw. 333, 568 P.2d 1207 (1977); *State v. Goudy*, 52 Haw. 497, 479 P.2d 800 (1971). Guided by *Terry*, we stated in *State v. Barnes*:

> To justify an investigative stop, short of arrest based on probable cause, "the police officer must be able to point to *specific and articulable facts which*, taken together with rational inferences from those facts, reasonably warrant that intrusion." [*Terry*, 392 U.S.] at 21[, 88 S.Ct. 1868]. The ultimate test in these situations must be whether from these facts, measured by an objective standard, *a man of reasonable caution would be warranted in believing that criminal activity was afoot* and that the action taken was appropriate.

58 Haw. at 338, 568 P.2d at 1211 (citations omitted).

*Bolosan*, 78 Hawai'i at 92, 890 P.2d at 679 (emphases added) (citation omitted) (some brackets in original).

▮▮▮ Additionally, we stated in *In re Doe*, 104 Hawai'i 403, 91 P.3d 485 (2004), *overruled on other grounds in*, *In re Doe*, 105 Hawai'i 505, 100 P.3d 75 (2004),—cited with approval in *Perez*, discussed *infra*,—that

> "[d]etermining the reasonableness of any search involves a twofold inquiry: *first, one must consider 'whether the ... action was justified at its inception,'* [*Terry*, 392 U.S. at 20, 88 S.Ct. 1868]; *second*, one must determine whether the search as ac-

seizure under article 1, section 7 of the Hawai'i

*tually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place[.]'*"

104 Hawai'i at 408, 91 P.3d at 490 (citation omitted) (emphases added). Put differently, it is well settled that a temporary investigative detention must, of necessity, be truly temporary and last no longer than is necessary to effectuate the purpose of the detention—*i.e.*, transpire for no longer than necessary to confirm or dispel the officer's reasonable suspicion that criminal activity is afoot. *In other words, a temporary investigative detention must be reasonably related in scope to the circumstances which justified the detention in the first place, and, thus, must be no greater in intensity than absolutely necessary under the circumstances.*

*Kaleohano*, 99 Hawai'i at 379, 56 P.3d at 147 (emphasis added) (citation omitted) (format altered).

**B.   *Constitutionality of the Traffic Stop and Subsequent Drug Investigation***

▮▮▮ Here, it is undisputed that the traffic stop for the speeding and vehicle registration infractions was constitutional inasmuch as it was based on "specific and articulable facts," *Bolosan*, 78 Hawai'i at 92, 890 P.2d at 679, *i.e.*, Officer Pauole's observation that Estabillio was speeding and the information received from dispatch that his vehicle registration was expired, and that "a man of reasonable caution would be warranted in believing that criminal activity was afoot," *id.*, *i.e.*, that Estabillio was violating certain traffic laws. Thus, the issue in this case is limited to whether the subsequent drug investigation was likewise constitutional. Mem. op. at 1.

As stated above, the ICA, relying on *Barros*, held that the circuit court did not err in denying Estabillio's motion to suppress "[b]ecause the evidence in the record substantially demonstrate[d] that the initial stop was lawful and *the narcotics canine screen* was conducted within the time reasonably required to conduct the traffic stop and issue the citations." *Id.* (emphasis added). Estabillio

Constitution.

argues that "the ICA's application of *Barros,* which neither party raised on appeal, sets a dangerous precedent by shifting the focus away from a *Bolosan* analysis to whether 'the narcotics canine screen was conducted *within the time* reasonably required to conduct the traffic stop[.]' " (Emphasis in original.) (Citing mem. op. at 5.)

In *Barros,* a police officer observed the defendant jaywalking; the officer

> approached [the defendant], intending to issue ... a citation for jaywalking. [The officer] forgot his citation book in his patrol car, and decided not to retrieve it. [The officer] identified himself to [the defendant], explained the reason for the stop, and informed [the defendant] that he was going to cite [him] for jaywalking. In response to [the officer's] request for identification, [the defendant] presented his State of Hawai'i Identification Card.
>
> [The officer] used his shoulder-mounted police radio to request a warrant check. He requested a warrant check because "this was a high drug activity area." [The officer] also stated that [the defendant] was "acting funny" because "he started shifting from one foot to the other ... trying to circle me." [The officer] interpreted his conduct as leading to a possible attack or that [the defendant] "just didn't wanna be there." In addition, [the officer] generally requests warrant checks to determine "if the person has any unfinished business with the court."
>
> At that time, [the officer] began to write down the salient information to issue a citation. Because he did not have his citation book with him, [the officer] recorded the necessary information in his notebook. Within a couple of minutes, dispatch confirmed that [the defendant] had outstanding warrants. [The officer] placed [the defendant] under arrest for contempt of court.

98 Hawai'i at 339, 48 P.3d at 586. Thereafter, the officer conducted a pat-down search of the defendant incident to his arrest and discovered drugs and drug paraphernalia. *Id.* The defendant moved to have the evidence suppressed, arguing, *inter alia,* that it was obtained through an unconstitutional warrantless pat-down search incident to an unlawful arrest. *Id.* at 338, 48 P.3d at 585. The circuit court denied the motion, and the defendant appealed following his conviction. *Id.*

In holding that "*[t]he act of calling in a warrant check during a traffic stop ... **does not amount to an unconstitutional search or seizure,**" id.* at 344, 48 P.3d at 594 (emphases added), we stated that:

> In order to pass constitutional muster, the length of time [the officer] could permissibly detain [the defendant] must have been "no greater in intensity than absolutely necessary under the circumstances." *[State v.] Kaluna,* 55 Haw. [361,] 369, 520 P.2d [51,] 58–59 [ (1974) ]. The warrant check was completed entirely within the time required for [the officer] to issue the citation. The evidence in the record also demonstrates that [the officer] neither used the stop as a pretext to allow him to request the warrant check, nor did he prolong impermissibly the stop in order to allow dispatch to complete the warrant check he requested. Moreover, there is no indication that [the officer] requested any information other than what was necessary to facilitate the warrant check. Thus, [the officer]'s detention of [the defendant] to run the warrant check did not constitute an unreasonable intrusion.

*Id.* at 342–43, 48 P.3d at 589–90 (footnote omitted).

The ICA seemingly based its holding in the instant case on its belief that, *because the canine screen* occurred during the time that was "reasonably required to conduct the traffic stop and issue the citations," mem. op. at 5, *Barros* applied. The ICA also apparently reasoned that, inasmuch as "Estabillio had no reasonable expectation of privacy in the airspace surrounding his vehicle," *id.* n. 3 (citation and internal quotation marks omitted), the canine screen was not a separate seizure and, thus, like *Barros,* there was no constitutional violation because the stop was not impermissibly prolonged. However, Estabillio argued on appeal (as he does on application) that it was Vice–Officer Prudencio's instigation of a "suspicionless and *unrelated drug **investigation** "*—not merely the

canine screen—that violated Estabillio's constitutional right to be free from unreasonable search and seizure.[12] (Emphases added.) As discussed below, the ICA's focus on the time frame for the "canine screen" overlooked Estabillio's contention. Stated differently, the ICA failed to apply this jurisdiction's case law requiring that a "temporary *investigative detention must be reasonably related in scope* to the circumstances which justified the detention in the first place." *Kaleohano*, 99 Hawai'i at 379, 56 P.3d at 147 (emphases added).

■ It is well-settled in this jurisdiction that "inquisitive questioning" by law enforcement can constitute an unconstitutional seizure. For example, in *State v. Quino*, 74 Haw. 161, 840 P.2d 358 (1992), we held that a defendant was "seized" under Hawai'i law when he was approached by police officers at the airport and the officer's questioning "turned from general to inquisitive" inasmuch as "a reasonable person in [the defendant's] position would not have believed that he was free to ignore the officer's inquiries and walk away." *Id.* at 173, 840 P.2d at 364. *See also State v. Trainor*, 83 Hawai'i 250, 256, 925 P.2d 818, 824 (1996) (holding that a defendant was "seized" when a police officer "began to ask him for information" because the officer's "questions were designed to investigate [the defendant] for drug possession, and [the defendant] was expressly made aware of that from the outset"); *State v. Kearns*, 75 Haw. 558, 567, 867 P.2d 903, 907 (1994) (holding that "a person is seized, for purposes of article I, section 7 of the Hawai'i Constitution, when a police officer approaches that person for the express or implied purpose of investigating him or her for possible criminal violations and begins to ask for information"); and *State v. Kachanian*, 78 Hawai'i 475, 481, 896 P.2d 931, 937 (App. 1995) (holding that defendant was "seized in

the constitutional sense" at the point that the police officers approached him and "began to ask him questions in furtherance of their investigation").

■ Here, the undisputed facts demonstrate that, prior to Officer Pauole's traffic stop of Estabillio, Vice–Officer Prudencio indicated that, if Officer Pauole "were to effect a traffic stop," he should notify Vice–Officer Prudencio because Estabillio was the target of a drug investigation. After the traffic stop occurred, Vice–Officer Prudencio—by his own admission—*proceeded to the scene of the traffic stop to investigate Estabillio for possible drug dealing, not the traffic offenses.* Upon arrival, Vice–Officer Prudencio approached Estabillio and began talking to him about drug dealing, using words to the effect that Vice–Officer Prudencio "had received information from a confidential informant saying that [Estabillio] was a mid-level cocaine dealer." He then requested that Estabillio consent to a search of his vehicle. Pursuant to the *Quino* line of cases cited above, such questioning amounted to a separate seizure, which was independent of and distinct from the traffic investigation. As such, the ICA's sole focus on the canine screen—without discussion of whether Vice–Officer Prudencio's *separate drug investigation* constituted a seizure—was error. Thus, the ICA also erred in its reliance on and application of *Barros*—which opined only on the constitutionality of an action (*i.e.*, a warrant check) that did not, in and of itself, amount to a seizure that was separate and distinct from the initial seizure related to the jaywalking offense.

■ Contrary to the ICA's application of *Barros*, the appropriate inquiry applicable under the circumstances of this case is found in *Perez*[13]: "*first, [one must consider] wheth-*

---

12. Estabillio *also* contended that the drug canine screening was "an illegal search which violated Estabillio's [a]rticle I, [s]ection 7 right to privacy." However, we read his primary argument as relating to the allegedly illegal and separate investigation by Vice–Officer Prudencio.

13. In *Perez*, the defendant was validly arrested for shoplifting air-freshener, "the glass container for which can be used to smoke crystal methamphetamine." 111 Hawai'i at 394, 141 P.3d at

1041. The police officers informed the defendant that bail would be fifty dollars and the defendant "had over [fifty dollars] of cash on his person at the time of his arrest." *Id.* At the police station the defendant was subject to a lawful pat-down search, and a coin purse was discovered. *Id.* Based on a belief that the defendant was "a known drug dealer," he was placed in his cell, and "all processing of him on the shoplifting charge ceased. The time for process-

er the ... *action was justified at its inception* ... *second, [one must determine] whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'"* 111 Hawai'i at 397, 141 P.3d at 1044 (emphases added) (citations omitted); *see also Kaleohano,* 99 Hawai'i at 379, 56 P.3d at 147 (likewise holding that a "temporary investigative detention must be reasonably related in scope to the circumstances which justified the detention in the first place"). Here, Estabillio was initially stopped for traffic violations, which stop was, as stated above, valid based upon the reasonable suspicion that he was speeding and driving a vehicle with a fraudulent registration sticker. Accordingly, Estabillio's initial detention was clearly "justified at its inception." *Perez,* 111 Hawai'i at 397, 141 P.3d at 1044. However, the determination "whether the search [or seizure] as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place," *id.,* requires closer scrutiny. As previously indicated, Vice–Officer Prudencio went to the traffic stop location *not* to investigate the traffic violations, but to conduct a drug investigation. Imme-

diately upon arrival, Vice–Officer Prudencio began questioning Estabillio regarding his involvement with drugs—not because of the presence of drugs or any drug paraphernalia in plain view in the vehicle subject to the traffic stop, but based on information from a confidential informant that Estabillio was a "mid-level cocaine dealer." Clearly, the investigation regarding Estabillio's alleged involvement with drugs was *not* reasonably related to the initial stop for the traffic offenses. Accordingly, under *Perez* (as well as under *Kaleohano* ), Vice–Officer Prudencio's investigation for drug involvement constituted a separate, distinct, and unrelated investigation. As such, Vice–Officer Prudencio's investigation must be supported by independent reasonable suspicion to be constitutional. *Bolosan,* 78 Hawai'i at 92, 890 P.2d at 679. If not, any drug evidence recovered must be suppressed as fruit of the poisonous tree.[14] *State v. Biggar,* 68 Haw. 404, 409, 716 P.2d 493, 496 (1986).

The evidence before the circuit court at the suppression hearing relating to Vice–Officer Prudencio's reasonable suspicion that Estabillio was in the possession of drugs was that Vice–Officer Prudencio (1) had informa-

---

ing an individual on a shoplifting charge runs from one hour to two hours. It will take one hour if the computer system is working properly and if things are 'smooth.'" *Id.* Approximately, two hours after his arrest for shoplifting, a canine screen was conducted on the defendant's coin purse, which resulted in an alert for drugs. *Id.* A search warrant was obtained, based primarily on the canine screen, and executed, resulting in the discover of drug and drug paraphernalia. *Id.*

The defendant sought to have the drug evidence suppressed as "fruit of an unjustified seizure of his person and closed coin purse." *Id.* at 395, 141 P.3d at 1042. The circuit court suppressed the evidence, and the prosecution appealed to this court. *Id.* We affirmed the circuit court's ruling, stating that:

> [T]he defendant's right to freedom from unreasonable searches and seizures prohibits ... delays [in processing] as a pretext to unjustified pre-incarceration searches. Here, the prosecution does not challenge the circuit court's finding that normal processing time for shoplifting arrests runs from one to two hours, but is one hour if things are running smoothly. It is also undisputed that Perez's detention ran into a second hour not because things were not running

smoothly, but because his processing had ceased while waiting for the narcotics detectives. Accordingly, given that the second hour of Perez's detention was concededly pretextual, it cannot be justified[.]

*Id.* at 397, 141 P.3d at 1044.

14. Estabillio briefly states on application that he

> urges this ... [c]ourt to formally recognize a reasonable expectation of privacy from search in seizure in their cars and in their persons as they travel Hawaii's roads.... Estabillio also urges this [c]ourt to impose a "reasonable suspicion" requirement to the use of a dog-sniff when an investigation has focused on a particular individual.

(Citations and some internal quotation marks omitted). In light of the discussion *supra,* concluding that Vice–Officer Prudencio's actions in this case constituted a separate investigation that was not reasonably related in scope to the circumstances which justified the detention in the first place and that it must be supported by independent reasonable suspicion to be constitutional, it is not necessary for us to examine whether a "reasonable suspicion" requirement should be imposed regarding the use of a "dog-sniff when an investigation has focused on a particular individual."

tion from a confidential informant that Estabillio was a mid-level drug dealer and (2) observed Estabillio to "be very nervous." Inasmuch as no evidence was presented during the suppression hearing regarding the identity or previous reliability of the "confidential informant," the tip that Vice–Officer Prudencio garnered from such informant was akin to an anonymous tip. The ICA has previously held that "an anonymous tip that [the d]efendant 'might have [drugs] in his possession'" was not sufficient to establish reasonable suspicion for an investigatory detention. *Kachanian*, 78 Hawai'i at 480–81, 896 P.2d at 936–37. Thus, Vice–Officer Prudencio's statement that a confidential informant had provided him with such information was insufficient to form the basis for a reasonable suspicion.

 Additionally, nervous, evasive behavior can be a pertinent factor in determining reasonable suspicion, *see Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); however, "unless it is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is of limited significance in determining whether reasonable suspicion exists." *United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir.2005) (citations and internal quotation marks omitted). In our view, Vice–Officer Prudencio's observation that Estabillio was "very nervous," without more, "is of limited significance in determining whether reasonable suspicion exists." *Id.* We, therefore, conclude that Vice–Officer Prudencio's separate drug investigation was not supported by reasonable suspicion. Consequently, the investigation constituted an unconstitutional seizure. Accordingly, all of the evidence recovered as a result of the unconstitutional seizure must be suppressed as fruit of the poisonous tree.

### IV. *CONCLUSION*

Based of the foregoing, we hold that Vice–Officer Prudencio's drug investigation constituted a seizure separate and distinct from the traffic investigation inasmuch as it was not "reasonably related in scope to the circumstances which justified the interference in the first place." *Perez*, 111 Hawai'i at 397,

141 P.3d at 1044. Additionally, because the prosecution failed to adduce "specific and articulable facts" to "reasonably warrant [the] intrusion," *Bolosan*, 78 Hawai'i at 92, 890 P.2d at 679, the drug investigation was unsupported by reasonable suspicion and, thus, was unconstitutional under article I, section 7 of the Hawai'i Constitution. Accordingly, we reverse (1) the ICA's March 25, 2009 judgment on appeal and (2) the circuit court's (a) December 28, 2007 judgment of conviction and sentence, entered *nunc pro tunc* to December 14, 2007, and (b) August 31, 2007 denial of Estabillio's motion to suppress.