**Electronically Filed
Supreme Court
SCWC-12-0000838
30-JUN-2016
07:44 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

---

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

ELUJINO V. ALVAREZ, III, Petitioner/Defendant-Appellant.

---

SCWC-12-0000838

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000838; CR. NO. 11-1-0216)

JUNE 30, 2016

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case arises out of a routine traffic stop and the subsequent arrest of Elujino V. Alvarez III for possession of methamphetamine. Prior to trial, Alvarez filed a motion to suppress drug evidence recovered as a result of a canine screen that was performed on his vehicle. Alvarez argued that the evidence was obtained in violation of the Fourth Amendment to the

U.S. Constitution and article I, section 7 of the Hawai'i Constitution.  All of the issues in Alvarez's appeal relate to his motion to suppress.

Alvarez was driving a vehicle that was stopped by police because one of the two passengers was not wearing a seatbelt.  During the stop, police officers recognized Alvarez as being involved in prior unrelated police investigations for drugs.  Based on the police officers' recognition of Alvarez, the officers telephoned another officer to come to the scene with his police dog to conduct a canine drug screen on the car.  The canine alerted to the presence of contraband, and Alvarez was arrested for possession of a controlled substance.

Alvarez filed a motion to suppress that evidence, which was denied by the circuit court.[1]  Alvarez entered a conditional no contest plea, and was convicted and sentenced for promotion of a dangerous drug in the third degree.

On appeal, the Intermediate Court of Appeals affirmed Alvarez's conviction.  However, we conclude that the ICA erred in affirming the denial of Alvarez's motion to suppress.  The canine narcotics screen was a separate unlawful seizure that was not reasonably related in scope to the original traffic stop.  Accordingly, we vacate the ICA's judgment on appeal and the circuit court's judgment of conviction and sentence, and remand for further proceedings consistent with this opinion.

---

[1] The Honorable Greg K. Nakamura presided.

## I. Background

The following factual background is taken from the record on appeal.

### A. Alvarez's Arrest and Indictment[2]

On June 9, 2011, Officer Brian Souki, Detective Paul Fukuda, and Detective Tod Bello were performing traffic enforcement in Hilo.[3] Detective Fukuda spotted a vehicle with a female front-seat passenger who was not wearing her seatbelt, and the vehicle was subsequently stopped by Detective Bello. Following the stop, Detective Fukuda recognized the driver of the vehicle as Alvarez. Detective Fukuda had previously encountered Alvarez and the two passengers of the vehicle, Mamone-McKeague and Kama, while he was assigned to the Hilo Vice Section. Detective Fukuda also stated that he had received "reliable confidential information" within the past five days that Alvarez was distributing crystal methamphetamine. Upon recognizing the occupants, Detective Fukuda contacted canine handler Officer David Reis to screen the vehicle. Officer Reis was at the Hilo police station when he received the call.

After stopping the vehicle, Detective Bello began issuing citations to Alvarez for driving without a valid license

---

[2] The summary of facts regarding Alvarez's arrest is taken from Officer Souki's police report and testimony given at Alvarez's June 15, 2011 preliminary hearing. These facts are not in dispute.

[3] Although these officers were conducting traffic enforcement on that particular day, their normal duty assignments were to the Area One Vice Section.

and without insurance, and to Kama for not wearing a seatbelt. After Officer Reis arrived at the scene, he screened the outside of the car with his dog, Nalu, who alerted to the presence of a controlled substance in the car. All three suspects were then arrested for promotion of a dangerous drug in the third degree.

The police obtained a search warrant to search the car. Officers found a bag containing a digital scale, two cut straws, two zip packets containing a crystal-like substance which tested positive for methamphetamine, seven empty unused zip packets, and numerous pieces of mail addressed to Alvarez.

Alvarez was charged with four counts on June 13, 2011. Count 1 alleged Promoting a Dangerous Drug in the Third Degree. Count 2 alleged Prohibited Acts Related to Drug Paraphernalia. Count 3 alleged Driving without a License. Count 4 alleged Conditions of Operation of and Registration of Motor Vehicles, "commonly referred to as No No-fault Insurance".

## B. Motion to Suppress

On February 8, 2012, Alvarez filed a motion to suppress evidence. Alvarez requested that the court suppress all evidence that was collected as a result of the canine screen of his car, on the ground that it had been obtained in violation of the Fourth Amendment of the U.S. Constitution and article I, section 7 of the Hawai'i Constitution.

Alvarez argued that the circuit court should suppress the evidence for two reasons. First, Alvarez argued that the

4

police officers improperly expanded the scope of the traffic stop into an unrelated drug investigation when they called for a canine screen without "specific and articulable facts" that gave them reasonable suspicion of any drug-related criminal activity. Alvarez argued that although Officer Souki had allegedly heard that Alvarez was involved in drug distribution, Officer Souki stated this was from a confidential informant, and therefore that it was "non-specific" and "non-articulable."

Second, Alvarez argued that the police officers improperly extended the length of time to issue the traffic citations to allow time for the canine screening unit to arrive. Alvarez argued that police officers may detain defendants no longer than is "absolutely necessary under the circumstances," and that at a hearing, he would be able to prove that the officers improperly extended the length of time it took to issue the traffic citations. As such, Alvarez argued that "all evidence in the instant matter that was collected based upon the improper canine screen of Defendant's motor vehicle should be suppressed."

On April 5, 2012, the circuit court held a hearing on Alvarez's motion to suppress.[4] At the hearing, Alvarez called as witnesses Officers Souki and Reis, and Detectives Bello and

---

[4] The transcript of this hearing in the record is dated April 5, 2011. However, this date is before Alvarez's motion to suppress was filed, and before he was even arrested. In his opening brief and application, Alvarez states the hearing was held on April 5, 2012. It thus appears that the year on the transcript is in error, and should be 2012.

Fukuda.

### 1. Officer Souki's testimony

Officer Souki testified to the following. On June 9, 2011, he, Detective Fukuda, Detective Bello, and Officer Moniz were conducting traffic enforcement. Detective Fukuda observed a car in which a female passenger was not wearing a seatbelt, and Detective Bello stopped the car. After the car had been stopped, Officer Souki contacted Officer Reis by phone to do a canine screening on the vehicle because Officer Souki recognized Alvarez from prior contacts with him, and because he had received information within the past five days from a "[r]eliable confidential informant" that Alvarez was dealing crystal methamphetamine.

However, Officer Souki could not recall having been given any information that Alvarez would be conducting drug transactions specifically on the day of Alvarez's arrest. Officer Souki also testified that he did not notice Alvarez in possession of any drugs or drug paraphernalia prior to calling Officer Reis. When the dog alerted to the presence of drugs, Officer Souki arrested all three occupants of the car.

### 2. Detective Fukuda's testimony

Detective Fukuda's testimony regarding the initial stop of Alvarez's car corroborated that of Officer Souki. Detective Fukuda also testified that he called Officer Reis's cell phone after he had been informed of the identity of the vehicle's

6

occupants, but that he did not observe any criminal activity other than the seatbelt violation.[5]

### 3. Detective Bello's testimony

Detective Bello testified that while he was issuing citations to Alvarez and Kama, they were not free to leave. Detective Bello testified that he had, within a week prior to the arrests, obtained information from a confidential informant that Kama was involved in drug distribution. However, Detective Bello had not received any information that Alvarez, Kama, or Mamone-McKeague would be in possession of any drugs specifically on June 9, 2011, and he did not observe any drugs or drug paraphernalia in the car.

### 4. Officer Reis's testimony

Officer Reis testified that he was at the police station when he was called by Officer Souki at approximately 3:30 p.m. on June 9, 2011. He was also called again sometime later by Detective Fukuda. Officer Reis stated that aside from the canine alert, Officer Reis did not see any other signs of drugs or drug paraphernalia in the car.

After Officer Reis had testified, defense counsel indicated that he had been attempting to track down and subpoena both Kama and Mamone-McKeague as witnesses, but so far had been

---

[5]     Detective Fukuda stated that, prior to the traffic enforcement operation on June 9, 2011, Detective Fukuda had asked Officer Reis to be available if needed--not because he necessarily expected to encounter any individuals sought by vice, but because if such a situation should arise, "a dog screen or a canine is always a big tool in our investigations."

unsuccessful.[6]  The circuit court then scheduled a further hearing for May 11, 2012.

### 5.  May 11, 2012 hearing

On April 12, 2012, at Alvarez's request, the clerk of the Third Circuit Court issued subpoenas for Kama and McKeague to testify at the May 11, 2012 hearing.

On May 11, 2012, the parties appeared before the circuit court for the continued hearing on Alvarez's motion to suppress.  Before any witnesses testified, the parties stipulated into evidence exhibits 16 and 17, which were Officer Reis's cell phone records.  These records showed that Officer Reis received two calls from Detective Fukuda:  one at 3:31 p.m. and one at 3:42 p.m, and that Officer Souki called Officer Reis once, at 3:31 p.m.

Additionally, Detective Bello testified again to clarify his testimony at the prior hearing.  Detective Bello testified that his statement at the April 5, 2012 hearing that he had "utilized the confidential informant to conduct a controlled purchase from Jaclyn Kama a week prior" was not correct.  He stated that, after checking his records, he realized the controlled purchase from Kama actually occurred approximately one month before Alvarez's arrest.[7]

---

[6]  Subpoenas for Kama and Mamone-McKeague were issued on March 20, 2012 for the April 5, 2012 hearing.

[7]  At the May 11, 2012 hearing, there was also testimony from Lieutenant Randall Ishii, the custodian of records for HCPD, and Roydon

(continued...)

After the witnesses had testified, defense counsel discussed with the court whether Alvarez would testify, and the following exchange occurred:

> [DEFENSE COUNSEL]: Your Honor, given the testimony I have no further questions--we have no further testimony except for my client. I'd like a minute to speak to him whether he would testify or not.
>
> THE COURT: So is it really a minute or more than a minute?
>
> [DEFENSE COUNSEL]: I would--hopefully it's a minute. I've had several conversations with him about this in the last couple days.
>
> THE COURT: Okay.
>
> [DEFENSE COUNSEL]: If it's gonna be more than a minute I'll notify the Court as soon as I can.
>
> THE COURT: You're asking for a recess or you're asking to talk to your client?
>
> [DEFENSE COUNSEl]: Just a minute to talk to my client.
>
> (The defendant and his counsel held a discussion off the record at 11:40 a.m.)
>
> [DEFENSE COUNSEL]: Your Honor, my client has advised me that at this point in time he's not going to elect to make a statement at this time, Your Honor.

The court did not ask Alvarez or defense counsel any further questions about Alvarez's decision not to testify. The court asked the parties to submit written closing arguments regarding the motion to suppress, and set a deadline of June 7,

---

(...continued)
Kobayashi, a police dispatcher for HCPD, who both testified regarding an event chronology for Alvarez's arrest on June 9, 2011. This chronology was consistent with the testimony offered by Detectives Fukuda and Bello, as well as Officer Souki.

9

2012 for these submissions.  The court also set a status hearing on June 25, 2012.

On June 6, 2012, the State filed its opposition to Alvarez's motion to suppress.  The State first argued that Alvarez did not have standing to object to the canine screen, and argued in the alternative that the canine screen was not a "search."  The State further contended that even if the police needed reasonable suspicion to conduct the screen, the officers' prior encounters with the vehicle's occupants were sufficient to establish a reasonable suspicion.  Finally, the State argued that even if Alvarez had established a constitutional violation, he had not established that the evidence at issue should be suppressed.  The State quoted from State v. Fukusaku, 85 Hawaiʻi 462, 475, 946 P.2d 32, 45 (1997) ("where the connection between the illegal acts and the discovery of the evidence is so attenuated that the taint has been dissipated, the evidence is not a 'fruit' and, therefore, is admissible") in support of its argument.  However, the State provided no further support for its contention that Alvarez's "fruit of the poisonous tree" claim should be rejected based on his failure to establish where the evidence was located.

On June 7, 2012, Alvarez filed his reply in support of his motion to suppress.  Alvarez argued that the only basis for the traffic stop was the seatbelt violation, and that the police officers unconstitutionally expanded this stop into a drug

investigation when they called Officer Reis to perform the canine screen. According to Alvarez, any investigation beyond the traffic infractions had to be "reasonably related in scope" to the infractions for which Alvarez's vehicle was stopped, unless the police had an "independent and reasonable articulable [sic] suspicion that criminal activity was afoot." Alvarez contended that here, the canine screen was an investigation that was not reasonably related to the traffic stop, and was not based on any "specific and articulable facts" that would warrant the search.

## C. Alvarez's motion to reopen the initial motion to suppress

On June 25, 2012, the parties appeared before the circuit court for a status hearing. Apparently, prior to this hearing, the circuit court had indicated to the parties that it would deny Alvarez's motion to suppress. However, the court's proposed ruling indicating that it would deny the motion does not appear to be in the record.[8] At the beginning of the hearing, defense counsel requested that the circuit court reopen Alvarez's motion to suppress because the two witnesses he had previously intended to call--Kama and Mamone-McKeague--were now available. In response to the court's question as to what the offer of proof was, defense counsel stated that, based on his discussions with

_____

[8] At the June 25, 2012 hearing, defense counsel stated that "I did get a copy of the court's decision this morning." In addition, at a later hearing on July 18, 2012, the deputy prosecuting attorney stated that "after the Court indicated what the proposed ruling was, I've prepared findings of fact, conclusions of law, and an order." Further, in his opening brief to the ICA and application to this court, Alvarez states when referring to the June 25, 2012 hearing that "the Trial Court had previously indicated it would deny" the motion.

the witnesses' counsel, both witnesses would testify that "from the time of the arrest to the time that the dog showed up it was more like 30 minutes," and that Alvarez had informed him that "during that time period, the police officers were speaking to them about other drug investigations." The court directed defense counsel to file the motion to reopen the suppression hearing.

On July 12, 2012, Alvarez filed his motion to reopen the suppression hearing with an attached declaration of counsel, in which defense counsel explained that despite three attempts, he was previously unable to subpoena either witness because of their involvements as defendants in other criminal prosecutions. In the declaration, defense counsel stated, as a ground for reopening the motion:

> 16. This Honorable Court denied Defendant's Motion to Suppress in part on the basis that the canine alert in the instant case occurred within in [sic] the time allowed to conduct a traffic investigation, and that there was no actual drug investigation during that period, and Defendant believes that witnesses Jacklyn [sic] Kama and Angelina Mamone-McKeague, who were subpoenaed for the earlier hearings, but through not [sic] fault of Defendant, were unable to be served, will be able to testify in support of his allegations of grave constitutional violations. However, both witnesses are currently in custody and [sic] residential drug treatment on the Big Island, and have been served, and are currently able to testify in this matter.
>
> 17. Accordingly, Defendant requests to re-open the portion of the hearing on the Motion to Suppress regarding the above referenced witnesses' testimony.

The State filed a response objecting to Alvarez's

12

motion to reopen the hearing.  The State argued that Alvarez had offered no offer of proof for the witnesses and no reasonable explanation as to why he could not have called Mamone-McKeague as a witness at the earlier hearing.  The State did concede that "[g]iven that [Kama] was a fugitive from justice" at the time of the first hearing, Alvarez had provided a reasonable explanation for being unable to call Kama as a witness at the first hearing.  The State also argued that Alvarez intentionally waited until after the circuit court had issued its proposed ruling to request reopening, which was improper "gamesmanship."

At a hearing on August 3, 2012, the circuit court indicated that it would grant Alvarez's motion to reopen the hearing on his motion to suppress.  The parties, and the one witness who was present at the hearing (Mamone-McKeague), were ordered to return to court for a further hearing on August 31, 2012.

On August 31, 2012, the parties appeared before the circuit court for the continued hearing.  Kama and Mamone-McKeague appeared as witnesses.

### 1. Jaclyn Kama's testimony

Kama testified that on June 9, 2011, she was a passenger in Alvarez's vehicle when it was stopped because she was not wearing her seatbelt.  Regarding the conversations she had with the officers during the traffic stop, Kama testified that Officer Souki asked her "about a prior incident that

13

involved me before," and then acknowledged that the incident was "related to a prior drug contact[.]" Kama also stated that she spoke to Detective Bello, and asked him why it was taking so long to write the ticket. In response, Detective Bello told Kama that the officers were "waiting for a ticket book" because they had run out of tickets.

### 2. Angelina Mamone-McKeague's testimony

Mamone-McKeague also testified that on June 9, 2011, she was in Alvarez's vehicle when it was stopped by police officers. Mamone-McKeague stated that the only conversation she heard between the officers and the vehicle's occupants was that one of the officers told Alvarez to take the key out of the ignition and that they had been stopped for a seatbelt violation.

### 3. Alvarez's request to testify

After Kama and Mamone-McKeague had testified, Alvarez, through counsel, requested to be allowed to testify: "Your Honor . . . Mr. Alvarez, although he didn't speak at the earlier motion to suppress, based upon the testimony of the last two witnesses, he would like to, um, invoke his right to speak at this . . . to testify at this particular hearing." The State objected on the grounds that the court had reopened the motion to suppress only to allow the two witnesses to testify, Alvarez had a full and fair opportunity to testify at the initial hearing, which he declined, and that his request to testify now was gamesmanship. Defense counsel argued that Alvarez had intended

14

to testify "from the beginning" and had only changed his mind because of the unavailability of Kama and Mamone-McKeague.  As an offer of proof, defense counsel stated:

> Your Honor, my understanding, speaking to him, the offer of proof would be . . . Alvarez would testify that he was the driver when the vehicle was pulled over.  That the vehicle was pulled over for, uh, approximately thirty minutes before, um, any, uh, drug screening.  An arrest was made for him that, in his experience, uh, that time was far in excess of what is normally, um, used to uh, issue a ticket.  He would also state that, um, Officer Bello, he believes, did engage, um, him in conversation, uh, regarding, uh, didn't he know that Jaclyn Kama, uh, I guess the whole vehicle, but he felt it was addressed to him, was why was Jaclyn Kama out, her husband had just been arrested for two eight balls.[9]  He would also testify as to specific acts that occurred that, uh, buttress his belief as to the length of time that this took place.

> After the State again objected, the circuit court

indicated that it would not allow Alvarez to testify:

> THE COURT:  . . . [W]e're supposed to reopen it just for the testimony of these two witnesses so, you know--
>
> [DEFENSE COUNSEL]:  I understand that that is what my specific motion did state, but I would just make the record that, um, these were two key witnesses that would, um, rebut the police officer's testimony in this particular case.  And my client had intended to testify, until the point in time where he didn't have these witnesses.
>
> THE COURT:  All right.  So I don't--I don't think I will allow Mr. Alvarez to testify at this juncture, because it was supposed to have been a limited reopening, was my impression.  So you got what you wanted in terms of the specific motion, and I think that should be the extent of it.

---

[9]    An "eight ball" commonly refers to a unit of measurement for narcotics equaling one-eighth of an ounce.  See State v. Miyashiro, 90 Hawaiʻi 489, 491, 979 P.2d 85, 87 (App. 1999).

After hearing brief arguments from each side, the circuit court indicated to the parties that it would not change its prior decision to deny Alvarez's motion to suppress: "I don't see anything that would change my mind, at this juncture, about the court's prior ruling, so I'll let that stand."

On September 19, 2012, the circuit court entered its "findings of fact, conclusions of law denying defendant's motion to suppress evidence" and order. The circuit court made the following findings of fact (FOFs):

> 1. On June 9, 2011 Defendant was the driver of a vehicle stopped by police because a passenger in his vehicle, Jaclyn Kama, was not wearing her seatbelt.
>
> 2. Police subsequently learned that Defendant did not have a valid driver's license.
>
> 3. Due to his lack of a driver's license, Defendant was unable to legally drive the vehicle away from the location of the traffic stop.
>
> 4. After recognizing the persons in the automobile as being known drug users, officers at the scene of the traffic stop called for a narcotic detection canine to screen the vehicle.
>
> 5. The narcotic canine screen alerted to the presence of illegal drugs within the vehicle prior to Detective Tod Bello completing the traffic citations.
>
> 6. After Officer David Reis brought the narcotic detection canine from the police station to the scene of the traffic stop, the canine screen itself took approximately ten seconds before there was an alert.
>
> 7. The initial detention of Defendant and the vehicle was only to the degree necessary to issue traffic citations.
>
> 8. The narcotic detection canine did not enter the vehicle, and sniffed only the airspace surrounding

16

the vehicle.

[8a.  No law enforcement officer asked the occupants of the stopped vehicle any questions regarding the possession or use of illegal drugs prior to the narcotic canine alert.][10]

9.  The canine screen took place during an otherwise valid detention for the traffic violations.

10.  The presence of the narcotic canine was not, under the circumstances of this case, so embarrassing or intrusive as to constitute a search under the Hawai'i or United States constitutions.

11.  The use of the narcotic canine was not unreasonable or abusive in this case.

The circuit court then made the following conclusions of law (COLs):

1.  The stop of Defendant's vehicle was valid at its inception.

2.  Police did not need independent reasonable suspicion to conduct the narcotic canine screen on Defendant's vehicle.  State v. Snitkin, 67 Haw. 168, 171 (1984).

3.  Once the narcotic canine alerted to the presence of illegal drugs within the vehicle, police had probable cause to arrest the occupants of the vehicle pending the application for a search warrant.

4.  The narcotic canine screen did not constitute an unreasonable search, as generally a canine sniff around the airspace of a closed container is not a "search" under the United States and Hawai'i constitutions.  State v. Snitkin, 67 Haw. 168, 171 (1984).

5.  Suppression is not warranted in this case.

## D.  Plea, conviction, and sentencing

On September 7, 2012, Alvarez entered a conditional no

---

[10]    Paragraph 8a was added as a change to the FOFs, COLs and order, and thus appears at the end of the document, after the order.

contest plea to promotion of a dangerous drug in the third degree, in exchange for the State dismissing all other counts and mitigation of his mandatory minimum term to time served. The circuit court entered its judgment of conviction and sentence on September 17, 2012, sentencing Alvarez to five years imprisonment with credit for time served.

**E.   Appeal to the ICA**

Alvarez filed a notice of appeal from the circuit court's order denying his motion to suppress evidence.

In his opening brief, Alvarez argued that the circuit court erred in denying his motion to suppress because (1) the police officers had no "specific and articulable facts" that warranted expanding the traffic stop into a drug investigation; (2) the police improperly extended the time of the traffic stop; and (3) the circuit court erred when it denied him his right to testify on his own behalf.

The ICA issued a memorandum opinion, concluding that the circuit court did not err in denying Alvarez's motion to suppress.

First, the ICA reasoned that the canine screen of Alvarez's car was not a "search" because an individual has no reasonable expectation of privacy in the airspace around his or her vehicle, relying on Snitkin, 67 Haw. at 171, 681 P.2d at 983. Second, the ICA held that there was no "separate seizure" of Alvarez beyond the legitimate traffic stop, and further that the

18

length of the stop did not violate Alvarez's constitutional rights. Finally, the ICA held that the circuit court did not abuse its discretion in denying Alvarez's request to testify at the reopened hearing. Relying on two cases which held that defendants' rights to testify were not violated when courts denied their requests to testify at reopened suppression hearings, United States v. Childress, 721 F.2d 1148 (1982) and People v. Peterson, 777 N.Y.S.2d 48 (App. Div. 2004), the ICA concluded that "a trial court's refusal to allow a defendant to reverse field and request to testify during a reopened hearing is not a violation of a defendant's constitutional rights." The ICA affirmed the circuit court's judgment of conviction and sentence.

Alvarez timely filed his application for writ of certiorari, presenting the following two questions:

> A. Did the [ICA] gravely err in its denial of [Alvarez's] Motion to Suppress on the grounds that (a) the canine screen was not a "search", and (b) that there was no separate seizure of Alvarez?

> B. Did the ICA gravely err in its decision that the Circuit Court did not abuse its discretion in denying Alvarez's request to testify at the reopened suppression hearing?

## II. Standards of Review

## A. Denial of motion to suppress

> We review a circuit court's findings of fact in a pretrial ruling according to the following standard:

> > Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding

19

> of fact is clearly erroneous when (1) the
> record lacks substantial evidence to
> support the finding, or (2) despite
> substantial evidence in support of the
> finding, the appellate court is
> nonetheless left with a definite and firm
> conviction that a mistake has been made.

State v. Okumura, 78 Hawaiʻi 383, 392, 894 P.2d 80, 89 (1995) (citations and internal quotation marks omitted). "The circuit court's conclusions of law are reviewed under the right/wrong standard." State v. Pattioay, 78 Hawaiʻi 455, 459, 896 P.2d 911, 915 (1995) (citation omitted). Furthermore,

> . . . the proponent of a motion to suppress has
> the burden of establishing not only that the
> evidence sought to be excluded was unlawfully
> secured, but also, that his or her own Fourth
> Amendment rights were violated by the search and
> seizure sought to be challenged.

State v. Abordo, 61 Haw. 117, 120-21, 596 P.2d 773, 775 (1979) (citation and footnote omitted) . . . . The proponent of the motion to suppress must satisfy this "burden of proof by a preponderance of the evidence." Pattioay, 78 Hawaiʻi at 466, 896 P.2d at 922 . . . (citation omitted).

State v. Anderson, 84 Hawaiʻi 462, 466-67, 935 P.2d 1007, 1011-12 (1997) (brackets and emphases omitted).

### III. Discussion

We agree with Alvarez that the circuit court erred in denying his motion to suppress.[11]  For the reasons discussed below, we conclude that the use of the canine screen was not "reasonably related in scope to the circumstances which justified the interference in the first place."  State v. Perez, 111

---

[11]  Alternatively, Alvarez argues that the circuit court erred when it denied his request to testify at the reopened hearing.  In light of our disposition, it is unnecessary to resolve this question, and accordingly, the ICA ruling as to this issue is also vacated.

Hawai'i 392, 397, 142 P.3d 1039, 1044 (2006).  Consequently, the evidence of contraband recovered from Alvarez's vehicle was unlawfully obtained.  Accordingly, we vacate Alvarez's conviction and sentence.

## A.  The permissible scope of investigative detentions

"A stop of a vehicle for an investigatory purpose constitutes a seizure within the meaning of the constitutional protection against unreasonable searches and seizures."  State v. Estabillio, 121 Hawai'i 261, 270, 218 P.3d 749, 758 (2009).

Whether a seizure pursuant to an investigative stop is reasonable depends on the application of a two-part inquiry that was first articulated by the U.S. Supreme Court in Terry v. Ohio, 392 U.S. 1, 19-20 (1967), and later adopted by this court in State v. Perez, 111 Hawai'i at 397, 142 P.3d at 1044.  If the police action fails to satisfy both parts of the Perez test, the evidence originating from that unlawful action must be suppressed.  See Estabillio, 121 Hawai'i at 273, 218 P.3d at 762.

As to the first part of the Perez test, the court must determine "whether the action was justified at its inception." Id.  "To justify an investigative stop, . . . the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  State v. Barnes, 58 Haw. 333, 338, 568 P.2d 1207, 1211 (2011) (internal quotations and citations omitted).

21

It is well settled that an investigative stop based on an officer's observation of an apparent traffic violation satisfies the first part of the Perez test.  See Estabillio, 121 Hawaiʻi at 273, 218 P.3d at 761 (noting that a fraudulent registration sticker and speeding provided valid justification for traffic stop); State v. Kaleohano, 99 Hawaiʻi 370, 378, 56 P.3d 138, 146 (2002) (observing that initial traffic stop was appropriate where defendant was seen swerving and crossing the double center line).  Here, Alvarez was initially stopped for a traffic violation because his passenger was not wearing a seatbelt.  Accordingly, Alaverz's initial detention was "justified at its inception."  Perez, 111 Hawaiʻi at 397, 141 P.3d at 1044.

It is the second part of the Perez test that is at issue here.  Under that part, the court must determine "whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place."  Id. (citation and internal quotation marks omitted).  This scope may be exceeded in either of two ways. First, any "temporary investigative detention" such as a traffic stop must be "truly temporary," i.e., it must "last no longer than is necessary to effectuate the purpose of the detention." Estabillio, 121 Hawaiʻi at 270, 218 P.3d at 758.  Second, the subject matter and intensity of the investigative detention must be limited to that which is justified by the initial stop.  See

22

id. at 271-72, 218 P.3d at 759-60 (initiation of an unrelated drug investigation when defendant was pulled over for a traffic infraction violated defendant's constitutional rights); see also State v. Goudy, 52 Haw. 497, 502, 479 P.2d 800, 804 (1971); Kaleohano, 99 Hawai'i at 378-79, 56 P.3d at 146-47; State v. Kaluna, 55 Haw. 361, 369, 520 P.2d 51, 58-59 (1974).

In this case, we hold that the investigation regarding Alvarez's alleged involvement with drugs was not reasonably related to the initial stop for the traffic offense, and was thus a separate and unrelated investigation that required independent reasonable suspicion.  See Estabillio, 121 Hawai'i at 273, 218 P.3d at 761; Kaleohano, 99 Hawai'i at 379, 56 P.3d at 147; State v. Bolosan, 78 Hawai'i 86, 92, 890 P.2d 673, 679.

**B.   The canine screen that led to Alvarez's arrest was not reasonably related in scope to the original traffic stop**

Alvarez argues that the evidence recovered was impermissibly obtained in violation of his constitutional rights. He contends that this case is similar to Estabillio, in which a defendant who was pulled over for traffic infractions was also obliged to undergo a canine narcotic screen that led to the discovery of drugs.  121 Hawai'i at 265, 218 P.3d at 753-54. Alvarez contends that, as in Estabillio, the police officers stopped his car for a traffic violation and then expanded the stop into a drug investigation that was not reasonably related in scope to the traffic stop or justified by any specific or articulable facts.  For the reasons stated below, we agree.

23

In Estabillio, Vice Officer Brian Prudencio called traffic enforcement Officer Robert Pauole to request assistance with a traffic stop of Estabillio. Id. at 263, 218 P.3d at 751. Officer Prudencio informed Officer Pauole that Estabillio's car registration sticker was expired, and told him that he believed there were drugs in the car. Id. Officer Pauole testified that he understood that the plan was for him to stop the car for the expired registration sticker, and that vice officers would then arrive to conduct a drug investigation. Id. at 263-264, 218 P.3d at 751-52. When Officer Pauole pulled over Estabillio, Officer Prudencio and other vice officers arrived at the scene. Id.

Upon arrival, Officer Prudencio told Estabillio that a confidential informant had advised him that Estabillio was a mid-level cocaine dealer. Id. at 265, 218 P.3d at 753. Officer Prudencio then called Officer Kenneth Quiocho to the scene to conduct a canine screen of Estabillio's car. Id. When the dog arrived, it alerted the officers to the presence of a controlled substance in the car. Id. at 265, 218 P.3d at 753-754.

The circuit court denied Estabillio's motion to suppress. Id. at 267-268, 218 P.3d at 755-756. On appeal, this court applied the two-part test from Perez. While the traffic stop for speeding and an expired registration was "clearly justified at its inception," we held that the separate drug investigation of Estabillio was not "reasonably related in scope" to the initial stop. Estabillio, 121 Hawai'i at 273, 218 P.3d at

24

761. This holding was based on the fact that Officer Prudencio had conducted a "drug investigation" that was "separate and distinct from the traffic investigation." Id. at 274, 218 P.3d at 762.

Here, Alvarez was stopped initially because Detective Fukuda observed a passenger in Alvarez's car not wearing a seatbelt. As in Estabillio, the police officers' initial stop of Alvarez was therefore justified at its inception. In addition, as in Estabillio, the canine screen that led to Alvarez's arrest was not reasonably related in scope to the circumstances which justified the original traffic stop.

In Estabillio, Officer Prudencio began to question Estabillio regarding his involvement with drugs as soon as he arrived at the scene of the traffic stop. 121 Hawaiʻi at 265, 218 P.3d at 753. This inquiry was not based on the discernible presence of any drugs or paraphernalia in the car, but rather on the assumption that Estabillio was "known to sell drugs" and information that Officer Prudencio had received from a confidential informant that Estabillio was "a mid-level cocaine dealer." Id. at 266, 218 P.3d at 754. This general information did not justify initiating an investigation into potential drug distribution. Id. at 267, 274, 218 P.3d at 755, 762.

Noting the lack of justification for the drug inquiries, this court then held in Estabillio that "the investigation regarding Estabillio's alleged involvement with

drugs was <u>not</u> reasonably related to the initial stop for the traffic offenses." <u>Id.</u> at 273, 218 P.3d at 761 (emphasis in original). This court determined that the ICA had erred in not considering the drug-related questioning instigated by Officer Prudencio in conjunction with the canine screen, and that it was this separate avenue of investigation that impermissibly expanded the detention beyond the scope of the original traffic stop:

> After the traffic stop occurred, Vice-Officer Prudencio--by his own admission--<u>proceeded to the scene of the traffic stop to investigate Estabillio for possible drug dealing, not for traffic offenses</u>. Upon arrival, Vice-Officer Prudencio approached Estabillio and began talking to him about drug dealing, using the words to the effect that Vice Officer Prudencio "had received information from a confidential informant saying that [Estabillio] was a mid-level cocaine dealer." He then requested that Estabillio consent to a search of his vehicle. . . . [S]uch questioning amounted to a separate seizure, which was independent of and distinct from the traffic investigation. As such, the ICA's sole focus on the canine screen--without discussion of whether Vice-Officer Prudencio's <u>separate drug investigation</u> constituted a seizure--was error.

<u>Id.</u> at 272, 218 P.3d at 760 (emphasis in original).

In the instant case, Alvarez was similarly subjected to an investigation that had no reasonable relation to the initial traffic stop. Like Estabillio, Alvarez was pulled over for a traffic infraction and subjected to a canine screen even though the officers did not notice any drugs or paraphernalia in the vehicle prior to ordering the canine screen. The screen was based primarily on information obtained from a confidential informant that Alvarez was involved in dealing crystal

26

methamphetamine. Both Officer Souki and Detective Fukuda explained that they had obtained reliable information within the five days preceding the arrest that Alvarez was involved in drug distribution. However, neither could recall receiving any information that Alvarez, Kama, or Mamone-McKeague would be involved in possessing or dealing narcotics on the particular day of the arrest.

While police officers may investigate matters unrelated to the original stop if they have an independent basis for reasonable suspicion to indicate that criminal activity is afoot, no such basis existed here. The only suggestion that Alvarez was involved in distributing contraband on the day of his arrest stemmed from a tip provided by a confidential informant, as well as police recognition of Alvarez and his passengers from prior drug-related contexts. As noted in Estabillio, a tip from a confidential informant under the circumstances here is "not sufficient to establish reasonable suspicion for an investigatory detention."[12] Id. at 274, 218 P.3d at 762. Moreover, if police

_____

[12] There are, of course, circumstances under which a tip from a confidential informant can generate reasonable suspicion to support an investigative stop. Where the informant is known to law enforcement, courts have considered whether that person had provided reliable information in the past, or whether there is an adequate factual basis that the person is a reliable informant. See, e.g., State v. Ward, 62 Hawaiʻi 459, 461, 617 P.2d 565, 567 (1980); State v. Joao, 55 Haw. 601, 602-04, 525 P.2d 580, 582-83 (1974).

However, the tip here lacked any specificity, only generally stating that Alvarez was dealing crystal methamphetamine, was provided five days before Alvarez was stopped, and no drugs were observed in the car. Furthermore, like in Estabillio, no evidence was presented to establish that the confidential informant was a reliable informant. 121 Hawaiʻi at 273-74,

(continued...)

27

recognition of Alvarez served as a basis for a separate investigative detention, any traffic stop could be improperly utilized to detain individuals based on their previous misconduct.

In the case at bar, the canine screen that occurred after the traffic stop was an investigatory act aimed specifically at the crimes of dealing or possessing narcotics. Given the complete absence of any reasonable indication that Alvarez's vehicle contained illegal contraband, the narcotics detection screen had no justifiable connection to the seatbelt violation that warranted the initial detention. Consequently, the request for and initiation of the drug screen in this case was unjustified, and such an action subjected Alvarez to the same kind of "separate, distinct, and unrelated investigation" that this court deemed constitutionally invalid in Estabillio. Id. at 273, 218 P.3d at 761. Lacking sufficient independent grounds to expand the stop into a narcotics investigation, the drug screen was unrelated to the seatbelt infraction. We therefore hold that the canine screen, as conducted under these circumstances, was an unreasonable and unlawful expansion of the initial traffic detention in violation of article 1, section 7 of the Hawaiʻi Constitution. See Perez, 111 Hawaiʻi at 397, 142 P.3d at 1044. As such, the evidence against Alvarez obtained as a result of the

---

[12](...continued)
218 P.3d at 761-62. Thus, the tip was not sufficiently reliable to establish reasonable suspicion for a separate investigation.

screen must be suppressed as "fruit of the poisonous tree." Estabillio, 121 Hawaiʻi at 274, 218 P.3d at 761 (quoting State v. Biggar, 68 Haw. 404, 409, 716 P.2d 493, 496 (1986)).

In light of our holding, the ICA incorrectly concluded that Estabillio is distinguishable from the instant case "because there was no separate search or seizure of Alvarez during the traffic stop." The ICA apparently reasoned "that inquisitive questioning by law enforcement" was necessary to establish that a "separate, distinct, and unrelated investigation" took place, and because the circuit court found "that no police officer questioned the vehicle occupants about possession or use of illegal drugs prior to the canine alert," there was no separate investigation.

However, we did not require "inquisitive questioning by law enforcement" in Estabillio. In Estabillio, we held that the subsequent drug investigation was separate and distinct from the traffic investigation inasmuch as it was not "reasonably related in scope to the circumstances which justified the interference in the first place. Estabillio, 121 Hawaiʻi at 273, 218 P.3d at 761 (applying Perez, 111 Hawaiʻi at 397, 141 P.3d at 1044). Here, law enforcement brought the canine to the scene of the traffic stop to investigate Alvarez for possible drug dealing that was unrelated to the traffic offenses that justified the initial stop. Under Perez, this became a "separate, distinct, and unrelated investigation" that required reasonable suspicion.

29

Appropriately applied, Estabillio is directly applicable to the facts of this case.

Finally, citing to State v. Snitkin, the ICA concluded that the manner of the canine screen did not unreasonably intrude on Alvarez's privacy interests.  However, Snitkin is distinguishable from the instant case.  In Snitkin, a Drug Enforcement Agency canine was patrolling a Federal Express cargo area to detect packages carrying narcotics.  The dog alerted his handler to a package addressed to Alan Snitkin as possibly containing contraband.  67 Haw. at 169-70, 681 P.2d at 982.  Based on this identification, the officer obtained a search warrant, opened the package, and confirmed that it contained cocaine.  Id. at 170, 681 P.2d at 982.  The officer then resealed the package, allowed Snitkin to pick up the package, and arrested him.  Id.  This court held that the dog's sniff of the airspace around the package did not constitute a search and we reversed the circuit court's suppression order.  Id. at 171-72, 681 P.2d at 983.

In Snitkin, we specifically noted that the packages were not detained.  By contrast, the use of the canine here was for the purpose of conducting an entirely separate investigation unrelated to the initial traffic stop, and thus constituted a distinct seizure that was not supported by any independent reasonable suspicion of current drug activity.  Accordingly, the

30

canine drug screen of the outside of Alvarez's vehicle was impermissible.

## IV. Conclusion

We hold that the canine screen was an unlawful seizure that was not reasonably related in scope to the circumstances which justified police involvement in the first place. Therefore, it violated Alvarez's rights under article I, section 7 of the Hawai'i Constitution.  Accordingly, we vacate (1) the ICA's May 7, 2015 judgment on appeal, and (2) the circuit court's September 17, 2012 judgment of conviction and sentence, and remand for further proceedings consistent with this opinion.

Justin P. Haspe
for petitioner

Shaunda A.K. Liu
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

